**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (#270796)
Kara M. Wolke (#241521)
Christopher Fallon (#235684)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  rprongay@glancylaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (# 219683)
Phillip Kim, Esq. (admitted *pro hac vice*)
Jonathan Stern, Esq. (admitted *pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SUNPOWER CORPORATIN SECURITIES LITIGATION | Case No.: 3:16-CV-4710-RS<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Ricardo Manes, Padraig McGowan, James Nguyen, Kevin Korbaylo, and Jason Martinez ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by SunPower Corporation ("SunPower" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by SunPower; (c) review of other publicly available information concerning SunPower; and (d) Plaintiffs' own investigation.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired SunPower securities between February 17, 2016, and August 9, 2016, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      SunPower is an energy company that delivers solar solutions to residential, commercial, and power plant customers.  The Company's offerings purportedly include: solar module technology and solar power systems that are designed to generate electricity over a system life typically exceeding 25 years; integrated Smart Energy software solutions; installation, construction, and maintenance, and monitoring services; and financing solutions for purchasing or leasing solar products.

3.      A major component of SunPower's business involves entering into Power Purchase Agreements (or "PPAs") with customers. Rather than sell solar panels to a user of electrical power directly, SunPower contracts to build a solar power plant, and to sell electricity to the commercial customer.  Then, SunPower sells the contract to receive payment for the electricity to a financing partner.  SunPower employs Power Purchase Agreements across multiple sectors of its business, but Power Purchase Agreements in the Power Plant sector are of

---

[1] "Defendants" refers collectively to SunPower, Thomas H. Werner, and Charles D. Boynton.

particular significance, for two reasons.   First, Power Plant manufacturing has typically represented a substantial portion of the company's revenues.   For instance, in 2015, the Power Plant sector accounted for 42% of SunPower's revenue, and in 2014 accounted for 67%. Second, Power Plant revenue is generated through a small number of large deals. Thus, Power Purchase Agreements are a significant endeavor for SunPower, and the closing or failure to close of even a single agreement can have a significant impact on the Company's financial performance.

4.      For years, SunPower's business, including its Power Purchase Agreement business, benefitted from various government subsidies in the form of tax incentives, including an Investment Tax Credit (or "ITC") connected to the purchase and installation of solar systems, and "bonus depreciation," which allows solar system owners to accelerate the rate at which they can depreciate the value of their systems by claiming depreciation of half of the solar facility after it is placed in service.

5.      The Investment Tax Credit and bonus depreciation were set to expire at the end of 2016.  The anticipated expiration of these programs created a strong incentive for both SunPower and its customers to complete contemplated transactions, including prospective Power Purchase Agreements, in 2016.  In November of 2015, SunPower issued 2016 financial guidance that specifically accounted for the effects of the expiration of the ITC and bonus depreciation incentives on sales.   In particular, SunPower anticipated that the expiration of these incentives would cause sales to accelerate in 2016.

6.      However, in December of 2015, Congress extended the Investment Tax Credit, removing the immediate incentive to complete deals in 2016.   Immediately upon this announcement, and unbeknownst to investors, one of SunPower's prospective customers with whom SunPower was negotiating a Power Purchase Agreement abruptly cancelled negotiations. In the beginning of 2016 other prospective customers began slowing down negotiations for power plants as well, indicating an unanticipated slow down in sales.

7.      Nevertheless, in February of 2016, SunPower issued full year 2016 financial guidance that did not take into account this slow down, including the collapse of one major Power Purchase Agreement.   Worse, SunPower specifically told investors that they *had*

considered the extension of the Investment Tax Credit and bonus depreciation in formulating their 2016 guidance, and when Defendants issued SunPower's updated guidance in February 2016 (accounting for the extended ITC and bonus depreciation programs), the new guidance matched the 2016 guidance issued in 2015, before the extension of the incentive programs became publicly known.  More specifically, SunPower's renewed guidance assured investors that Defendants had considered the impact of the extension of the Investment Tax Credit and, despite the possibility that it could slow market demand in 2016, that SunPower's business was unaffected. In so assuring investors, Defendants also failed to disclose that, in reality, SunPower had already lost at least one large deal and was continuing to have difficulty closing others.

8.      Then, on August 9, 2016, SunPower issued a press release announcing disappointing second quarter 2016 financial results.  Therein, the Company disclosed the existence of several factors negatively impacting the Company's performance, including, most prominently "customers adopting a longer-term timeline for project completion" due to the extension of the tax credits.  The Company also disclosed "aggressive [Power Purchase Agreement ("PPA")] pricing by new market entrants," and "continued market disruption in the YieldCo environment."  These additional factors were exacerbated by the extension of the tax credits.  The Company also announced a manufacturing realignment which the Company stated would result in restructuring charges totaling $30-$45 million, a substantial portion of which would be incurred in the third quarter of 2016.  Finally, the Company disclosed that, as a result of these "challenges," it was substantially decreasing its fiscal year 2016 guidance—expecting a net loss of $175 million to $125 million, rather than the earlier-forecasted net income of $0 to $50 million.

9.      SunPower also held an earnings call on August 9, 2016 during which Defendant Boynton disclosed that the extension of the ITC and bonus depreciation in late 2015 significantly altered the completion timing and PPA pricing dynamics for 2H16 projects:

> The extension of the ITC in late 2015 significantly altered the completion timing and PPA pricing dynamics for certain second half 2016 projects, delaying project completion schedules and reducing expected PPA pricing.

Additionally, the inclusion of the bonus deprecation has reduced some of key customers' abilities to buy more projects as they have fully utilized their near-term tax equity capacity. This has also affected both project timing and pricing. Specifically, we had one project where the PPA off-take was in late-stage negotiation and the customer exited after the ITC extension.

We then expected to sign a PPA for this project in the first half of 2016 for 2016 delivery. We still expect to sign a PPA for this project in 2016, but now expect 2017 delivery. Together, we expect these factors related to ITC and bonus depreciation extension will impact our second half 2016 EBITDA by between $70 million to $90 million.

10.     On this news, SunPower's stock price fell $4.47 per share, or 30%, to close at $10.31 per share on August 10, 2016, on unusually heavy trading volume.

11.     Throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose: that a substantial number of the Company's customers were adopting a longer-term timeline for project completion due to the extension of the tax incentive programs, and that SunPower was aware of this, and did not incorporate it into their financial guidance forecasts (while claiming that they had). In addition, because SunPower's competitors were improving the quality of their product in comparison to SunPower's, this delay only heightened the threat to SunPower's profit margins and ability to retain customers.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information,

occurred in substantial part in this Judicial District.  In addition, SunPower's principal executive offices are located within this Judicial District.

16.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

17.     Plaintiff Ricardo Manes, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Plaintiff Padraig McGowan, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.     Plaintiff James Nguyen, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.     Plaintiff Kevin Korbaylo, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.     Plaintiff Jason Martinez, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.     Defendant SunPower is a Delaware corporation with its principal executive

offices located at 77 Rio Robles, San Jose, California 95134.  SunPower's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "SPWR."

23.    Defendant Thomas H. Werner ("Werner") was, at all relevant times, the President, Chief Executive Officer ("CEO"), and a Director of SunPower.

24.    Defendant Charles D. Boynton ("Boynton") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of SunPower where he leads the company's treasury, project finance, investor relations, financial planning and accounting organizations. He also currently serves as Chairman and Chief Executive Officer of 8point3 Energy Partners. Previously, he was the company's vice president of corporate finance and corporate development, with global responsibility for finance, planning and analysis and leading strategic investments, joint ventures, and mergers and acquisitions.

25.    Defendants Werner and Boynton are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SunPower's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## THE FRAUD

### A.    SunPower's Business

26.    SunPower is an energy company that delivers solar solutions to residential,

commercial, and power plant customers.  The Company's offerings include: solar module technology and solar power systems that are designed to generate electricity over a system life typically exceeding 25 years; integrated Smart Energy software solutions; installation, construction, and ongoing maintenance, and monitoring services; and financing solutions for purchasing or leasing solar products.

27.    SunPower also has a 40.7% ownership stake in 8point3 Energy Partners LP ("8point3"), a joint Yieldco vehicle formed by the Company and First Solar, Inc. ("First Solar") to own, operate and acquire solar energy generation assets.  8point3 has a right of first offer ("ROFO") agreement with SunPower on interests in the Company's solar energy projects that are currently contracted or are expected to be contracted before being sold by the Company to other parties.

28.    In addition to selling systems to commercial, residential, and power plant customers, SunPower also enters into contracts, called Power Purchase Agreements (or "PPAs"), whereby SunPower installs solar panels for the customer and agrees to sell power generated by those panels to the customer.  SunPower then sells the installed solar system to an investor or financing company, and the customer pays that investor or financing company for the power over an extended period of time based on the energy consumed.

**B.    The Impact of the Solar Investment Tax Credit (or "ITC")**

29.    For many years, SunPower has benefitted from a federal government subsidy for renewable energy called the "Investment Tax Credit" (or "ITC"), which entitles purchasers to receive a tax credit for a percentage (currently 30%) of the cost of installing solar panels – thereby incentivizing purchasers and increasing sales.

30.    Under a PPA, the developer (here SunPower) arranges for the design, permitting and financing of the solar system on the host customer's property. The developer sells the energy created by the system to the host customer at a fixed rate that is typically lower than what is charged by the local utility. The lower price permits the customer to begin saving upon installation, while the developer receives income as well as the Investment Tax Credit.

31.    In addition to the Investment Tax Credit, Congress had for many years allowed

for accelerated depreciation known as "bonus depreciation." The 50% bonus depreciation allowed system owners to claim depreciation of half of their solar facility after it is placed in service.  By receiving the right to take accelerated depreciation, companies are able to take tax deductions in earlier years, which is typically financially beneficial.

32.     The ITC and bonus depreciation were set to expire at the end of 2016, which, according to Defendants, created a strong incentive for potential customers to complete deals in 2016. SunPower's financial planning prior to the class period incorporated the assumption that the ITC would expire at the end of 2016.

**C.      Defendants Guide Toward Growth in 2016**

33.     On November 12, 2015, SunPower held an Analyst Day presentation where Defendant Werner announced the Company was "back to growth."

34.     The Company issued financial projections for the 2016 fiscal year that relied in part on a planned run-up in sales in 2016, as customers would supposedly rush to purchase solar systems in advance of the end-of-2016 Investment Tax Credit and bonus depreciation expiration. Thus, Defendant Werner announced: "For fiscal year 2016, the company expects non-GAAP revenue of $3.3 billion to $3.5 billion, gross margin of 13 percent to 15 percent, EBITDA of $515 million to $565 million, capital expenditures of $210 million to $240 million and gigawatts (GW) deployed in the range of 1.7 GW to 2.0 GW. On a GAAP basis, the company expects revenue of $1.2 billion to $1.4 billion, gross margin of 16 percent to 18 percent and net loss of $415 million to $365 million."

35.     Defendant Boynton discussed the Company's 2016 outlook:

And I want to point out that North American megawatts are growing 30%. So we're seeing really strong residential volume growth in the U.S. ahead of the ITC step-down. We're seeing commercial growth of 65% in megawatts deployed, so very significant commercial growth.  And then in the power plant at a midpoint of 1.1, an *81% increase in the overall volume of megawatts deployed for power plants*.

36.     Defendant Boynton espoused the sentiment that customers would rush to purchase systems in 2016 to "capitalize on the value of the ITC," and further suggested the Company's

shift into international markets in 2017 would offset any decreased demand in North American following the expiration of the Investment Tax Credit:

> So if we now look overall at our global expansion. Our business is becoming more global. We see a significant increase in 2017 and you'll see intentionally our shift, the chart is in the right, you'll see intentionally our shift from Americas to our international markets. And really there's sort of a polling effect quite frankly from 2017 to 2016 to capitalize on the value of the ITC.

**D.     The ITC and Bonus Depreciation Are Extended in December 2015; SunPower Holds Firm on its Guidance and Defendants Successfully Convince Analysts and Investors Alike that SunPower Is "Bucking the Trend"**

37.     After heavy lobbying by the solar industry, Congress in fact renewed the ITC in December of 2015, maintaining a 30% credit until 2019 for residential and commercial projects, which would gradually decline to 10% for commercial projects and 0% for residential projects after 2021.  In concert with the ITC extension, Congress extended 50% bonus depreciation for property placed in service before 2018, declining in subsequent years to 40% in 2018 and 30% in 2019.

38.     Although the extension of the Investment Tax Credit and bonus depreciation would be, in the long term, beneficial to the solar industry, it removed the urgency for 2016 projects, which was fundamental to SunPower's business planning and factored into 2016 guidance.

39.     Defendants felt the impact of this extension immediately, when one prospective customer terminated negotiations in late 2015 immediately upon, and due to, announcement of the tax credit extension.  In addition, by early 2016, other customers began to delay negotiations as a result of the extension of the ITC.

40.     On February 17, 2016, the Company issued its financial results for the 4th quarter and fiscal year 2015, which stated:

> The company's fourth quarter financial results reflected a shift of approximately $65 million in EBITDA originally forecasted to be recognized in fiscal year 2016. This shift was primarily due to earlier than forecasted project completions in power plants, accelerated recognition of residential leases and earlier than anticipated benefits related to 8point3 Energy Partners. As a result of this

approximately $65 million EBITDA shift, the company now expects 2016 EBITDA to be in the range of $450 million to $500 million compared to previous guidance of $515 million to $565 million. For 2017, the company believes that with the ITC extension, further investment in the U.S. market and a strong global project pipeline, it is well positioned to sustainably grow its EBITDA.

For fiscal year 2016, the company's non-GAAP expectations are as follows: revenue of $3.2 billion to $3.4 billion, gross margin of 14 percent to 16 percent, capital expenditures of $210 million to $240 million and gigawatts deployed in the range of 1.7 GW to 2.0 GW. On a GAAP basis, the company expects 2016 revenue of $2.2 billion to $2.4 billion, gross margin of 17 percent to 19 percent and net income of $0 million to $50 million.

41.     Thus, Defendants' renewed projections assumed that that all of the deals that SunPower had previously projected would close in 2016 fueled by the planned expiration of the Investment Tax Credit and bonus depreciation, would still close in 2016 even though the extension of the Investment Tax Credit and bonus depreciation, meant that customers no longer had any incentive to rush to complete deals in 2016,

42.     Defendants were aware that the extension of the tax incentives would likely result in delayed deals and slower sales due to the removal of pressure to complete those deals by the end of 2016 and the disincentives that the extension of bonus depreciation had on solar projects. Nonetheless, SunPower did not adjust its projections downward to account for a reduced deal flow in 2016, while at the same time assuring customers it was considering these head-winds in its projections.  The Company re-issued guidance that was largely unchanged, except for an adjustment of $65 million in revenue that previously was expected to be recognized in 2016 that was, in fact, recognized early, in 2015.

43.     In an analyst presentation that same day, Defendant Boynton reaffirmed the Company's business plan and its 2016 projections, with the only exception being that one 2016 project had been pulled into 2015:

Our strong performance was primarily driven by the completion of the projects that were sold to 8point3 as part of the IPO. In addition, we benefited from strong execution as the number of projects were completed in Q4 that were planned for 2016. This resulted in a $65 million shift of EBITDA from early 2016 in the Q4 of 2015.

As Tom will discuss, this was a timing issue, and *we still expect our 2015 and 2016 combined EBITDA to be in the same range or even a bit higher than we*

*guided at Analyst Day in November.*

44.     Defendants' efforts to convince analysts and the investing public that they had considered the impact of the extension of the tax credits properly, and that they would not negatively impact 2016 performance, were successful. Following the earnings call, Credit Suisse issued a report stating that 2016 guidance was lowered to reflect the shift of one project from 2016 to 2015, but overall EBITDA 2015-2016 remains unchanged.  It stated, "While the market seems to fear demand challenges and more difficult access to capital across the solar space, SunPower is bucking the trend and remains in a healthy position with a clean balance sheet and an execution track record that is enabling growth."

45.     On May 1, 2016 SunPower held an earnings call to discuss its first quarter 2016 financial results.  While the Company reduced its guidance for 2Q'16, it noted that this was due to a large number of large-scale projects it expected to complete in the second half of the year; and therefore, it maintained its full year 2016 guidance.  Defendant Werner also indicated confidence in achieving the Company's 2016 guidance projections:

> Please note that our Q2 2016 guidance reflects the impact of our HoldCo strategy, as we expect to complete a significant number of large-scale projects in the second half of this year. For 2016, our non-GAAP guidance remains unchanged, as we feel we are well-positioned to achieve our goals, as global solar fundamentals remain strong.

46.     Analysts participating on the call inquired about the demand for projects:

> <Q - Tyler Charles Frank>: Great. Thanks. A quick follow-up. Can you discuss what you're seeing just in the general marketplace not for 8point3, but for third-party buyers, just the overall demand for projects right now. Has there been any slowdown or any pickup?

> <A - Charles D. Boynton>: I'd say, it's consistent. This is Chuck. It's consistent with where we were last quarter. *We have this strong demand for our projects from third-party buyers and we're in negotiations right now to close several deals, so we're feeling that it's consistent with where we were last quarter*.

47.     J.P. Morgan also issued a report on May 5, 2016 noting that FY16 guidance was reiterated and "Management commentary remains optimistic with near-term growth driven by the distributed generation business along with projects slated for sale during 2H. Demand

remains robust, and the company views the struggles of other competitors as an opportunity to acquire projects that can add to visibility."

48.     On July 21, 2016 Credit Suisse issued a report prior to SunPower releasing its Second Quarter 2016 financial results, stating, "Bottom line - don't expect any deviations from annual guidance, focus on pricing pressures and 2017: We expect Q2 results to be in line with estimates (like Q1) given the year is 2H weighted. Any deviations would more likely be the result of project timing and should not impact 2016 guidance. Focus should be on 2H16 deliveries (for any signs of delay), impact of industry oversupply and pricing pressures, and any clues on 2017 earnings power beyond contracted backlog."

49.     Guggenheim issued a report on July 27, 2016 announcing that it was upgrading SPWR to BUY.  It stated:

> Our view on the valuation has not changed; however, at these levels and given recent developments, we believe the shares of SPWR have a compelling risk-reward profile. First, the concerns around 2H16 results that were keeping us on the sidelines are now alleviated, and we think this should remove the overhang on the shares. As a reminder, due to its project delivery schedule, SPWR's management expected to generate over 90% of 2016 EBITDA in 2H'16. Due to improved capital market conditions and recent developments at 8Point3 (CAFD, NEUTRAL, $17.14), we view these deliveries funding as substantially derisked at this stage.

50.     J.P. Morgan issued a report on August 5, 2016 just days before SunPower announced its 2Q'16 financial results, noting that "While we believe the company is well positioned for 2H16 owing to project timing, investor focus will likely be on visibility into FY17 owing to an industry-wide post-ITC slowdown."  The report also stated, "Expect FY16 guidance to be reiterated owing to visibility into 2H projects."

### E.     Defendants Deliberately Concealed the Impact of the ITC and Bonus Depreciation Extension During the Class Period

51.     As detailed above, throughout the first half of 2016, Defendants steadfastly denied – in face of repeated analyst inquiry – that the ITC and bonus depreciation extension would cause any negative impact upon 2016 sales. And they recklessly failed to factor depressed

demand as a result of the ITC and bonus depreciation extension into the Company's 2016 guidance even though analysts predicted it and the slow-down was being experienced industry-wide. Instead, Defendants were able to convince analysts and investors alike that, despite the ITC and bonus depreciation extension, demand remained strong and sales were unaffected.

52.     Contrary to this rosy public picture, however, Defendants were well aware that the extension of the ITC and bonus depreciation was, in fact, reducing 2016 earnings. Defendants revealed on the August 9, 2016 earnings call that immediately after the extension of the Investment Tax Credit, in December of 2015, a prospective customer with whom SunPower was negotiating a Power Purchase Agreement immediately terminated negotiations.  In addition, by the first quarter of 2016, SunPower had difficulty closing deals that it had expected to close.

53.     According to CW 1, who was a Senior Director of EPC Project Development for 18 months ending in October of 2016, by February or March of 2016 it had become apparent that many prospective customers were slow to sign and finalize deals.  CW1 stated that customers were slow to return calls or answer emails and SunPower executives were "hanging in there" hoping three or four deals would close that would have otherwise closed had the ITC not been extended.  CW 1 learned this because he worked closely with the business development and finance teams, that were working on these sales.  Several large deals lost momentum after the Investment Tax Credit was extended and customers were "dragging feet" and milestone dates were missed.

54.     CW2 began employment with SunPower in February 2012, and was the Director of Commercial Operations & Maintenance at SunPower from October 2015 until January 2017 and Director of Business Development Operations & Maintenance from January 2017 until April 2017.  CW2's department was involved after the solar panels were installed and operational; however, CW2 was aware of construction and pending deals.  CW2 did not believe SunPower's supply chain could meet the demand for projects to be completed in 2016, prior to the extension of the ITC.  CW2 stated that there was an urgency to complete projects before the ITC expired and there were a number of large in-process projects with investors lined up to buy them. CW2 stated that when the ITC was extended PPA pricing was declining and there was no longer an

urgency to complete projects as customers waited to see how low PPA pricing would drop and investors began to pull out.

55.    CW2 noted the long development cycle for utility power plant projects indicating that it could take a year or longer to acquire the land and permits.  CW2 stated that SunPower would obtain financing on the front-end and would find a potential buyer once the project was completed.  CW2 stated that construction funding and buyers for projects slated for completion in 2016 fell through following the ITC extension.  CW2 believed SunPower was engaged in trying to find replacement buyers for these projects.

56.    CW2 stated that if SunPower announced the impact of the ITC extension in February 2016 the market would have tanked and if they found later found replacement buyers, the shareholders would have blamed the Company for announcing too soon.  CW2 indicated that employees discussed amongst themselves that SunPower's executives probably knew the impact the extension of ITC was having sooner than it was announced.

57.    CW2 stated that 8point3 raised funds to pay off projects or build more projects. CW2 stated that 8point3 relied on growth to provide a return on investment to investors, yet when a number of 2016 projects did not happen due to the ITC extension, it could not provide that return.

58.    CW3 was a contract Project Scheduler at SunPower from October 2015 until March 2016. CW3 reported to Schedule Manager Steve Long [CW3 was uncertain of the precise last name] who reported to the Project Controls Manager, Jordan [last name unknown].  In this position, CW3 was responsible for tracking the scheduling and costs involved in projects.  CW3 tracked costs and conducted weekly schedule meetings with the project management team to ensure that the scheduled outline in the PPA was being adhered to.  CW3 was assigned to three power plant projects during CW3's tenure at SunPower: Rosemont, located in/near Death Valley; Boulder, located in Nevada outside of Las Vegas; and Henrietta, located near Bakersfield, CA.  CW3 indicated SunPower hired CW3 as a contractor because the Company expected a lot of project work due to the ITC expiration, yet when the ITC was extended there was not as much work and CW3's hours were reduced causing CW3 to leave the Company.

CW3 indicated that in approximately June 2016, there were significant layoffs at SunPower and CW's manager and two other Schedulers were laid off.

59.    CW3 stated that the projects CW3 worked on began slowing down and not meeting milestones.  CW3 stated that the second phase of the Rosemont power plant project was falling behind the milestones set by the PPA.  CW3 stated that Rosemont was supposed to have a third phase, but CW3 doubted it would be constructed.  CW3 believed Southern California Edison was the purchaser of the energy or PPA holder for the Rosemont project.  CW3 was trained on the Henrietta project, and while CW3 did not work directly on that project, CW3 was made aware that Henrietta was also delayed as a result of the slowdown caused by the extension of the ITC and bonus depreciation.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

60.    The Class Period begins on February 17, 2016, with SunPower reporting fourth quarter and fiscal year 2015 results, and setting forth the Company's 2016 financial guidance. SunPower issued a press release entitled, "SunPower Reports Fourth Quarter and Fiscal Year 2015 Results."  Therein, the Company, in relevant part, stated:

**Financial Outlook**

Given strong global demand as well as a favorable policy environment, the company remains very confident that it can achieve its long term strategic and financial goals by leveraging its flexible business model to drive sustainable growth. With the recent extension of the ITC, the company anticipates increasing its investment in the United States while maintaining its global go-to-market focus.

The company's fourth quarter financial results reflected a shift of approximately $65 million in EBITDA originally forecasted to be recognized in fiscal year 2016. This shift was primarily due to earlier than forecasted project completions in power plants, accelerated recognition of residential leases and earlier than anticipated benefits related to 8point3 Energy Partners. As a result of this approximately $65 million EBITDA shift, the company now expects 2016 EBITDA to be in the range of $450 million to $500 million compared to previous guidance of $515 million to $565 million. For 2017, the company believes that with the ITC extension, further investment in the U.S. market and a strong global project pipeline, it is well positioned to sustainably grow its EBITDA.

***For fiscal year 2016, the company's non-GAAP expectations are as follows:***

*revenue of $3.2 billion to $3.4 billion, gross margin of 14 percent to 16 percent, capital expenditures of $210 million to $240 million and gigawatts deployed in the range of 1.7 GW to 2.0 GW. On a GAAP basis, the company expects 2016 revenue of $2.2 billion to $2.4 billion, gross margin of 17 percent to 19 percent and net income of $0 million to $50 million.* Fiscal year 2016 GAAP guidance includes the impact of the company's HoldCo strategy and deferrals due to real estate accounting.

61.     The foregoing statement was materially misleading for failing to disclose that SunPower did not factor into its projections for Fiscal Year 2016 the negative impact that the extension of the ITC and bonus depreciation would have on 2016 revenues. Specifically, Defendants failed to adjust SunPower's 2016 projections to take into account the PPA deal that had already fallen through in December 2015 due to the extension of the ITC, as well as renewed uncertainty and likely delayed or longer timelines relating to all other deals.

62.     On the February 17, 2016 earnings call discussing the financial results for Q4'15 Defendant Werner reaffirmed the Company's business plan, as well as the Company's 2016 projections which were earlier provided in November 2015, with the only exception being that one 2016 project had been pulled into 2015:

> Our strong performance was primarily driven by the completion of the projects that were sold to 8point3 as part of the IPO. In addition, we benefited from strong execution as the number of projects were completed in Q4 that were planned for 2016. This resulted in a $65 million shift of EBITDA from early 2016 in the Q4 of 2015.
>
> As Tom will discuss, this was a timing issue, and *we still expect our 2015 and 2016 combined EBITDA to be in the same range or even a bit higher than we guided at Analyst Day in November.*
>
> Looking forward to 2017 and beyond, we are very encouraged by the recent ITC extension, as this should improve both volumes and margins in the U.S. market. Specifically on the P&L, our strong non-GAAP revenue was primarily driven by our 135 megawatt Quinto project which accounted for approximately $900 million in total revenue.

63.     The foregoing statement was materially misleading for failing to disclose that SunPower did not factor into its projections for Fiscal Year 2016 the negative impact that the extension of the ITC and bonus depreciation would have on 2016 revenues. Specifically, Defendants failed to adjust SunPower's 2016 projections to take into account the PPA deal that

had already fallen through in December 2015 due to the extension of the ITC, as well as renewed uncertainty and likely delayed or longer timelines relating to all other deals.

64.    On February 19, 2016, SunPower filed its Annual Report with the SEC on Form 10-K for the fiscal year ended January 3, 2016.   The Company's Form 10-K was signed by Defendant Boynton, and reaffirmed the Company's financial results announced in the press release issued on February 17, 2016. With respect to the Company's 2016 guidance, the 2015 10-K also stated that:

> "*We have incorporated into our financial planning and agreements with our customers certain assumptions regarding the future level of U.S. tax incentives, including the ITC* and Cash Grant, which is administered by the U.S. Treasury Department ('Treasury') and provides cash grant payments in lieu of the ITC. The ITC and Cash Grant allow qualified applicants to claim an amount equal to 30% of the eligible cost basis for qualifying solar energy property. We hold projects and have sold projects to certain customers based on certain underlying assumptions regarding the ITC and Cash Grant, including for CVSR and Solar Star. We have also accounted for certain projects and programs in our business using the same assumptions."

65.    The foregoing statement was materially misleading because, in reality, SunPower's financial projections and accounting did not incorporate SunPower's own internal assumptions regarding the future level of ITC incentives and the corresponding impact upon the Company's sales. Specifically, contrary to Defendants' assurances that the ITC extension was taken into account, the guidance did not incorporate a slowdown in deals in 2016 due to the extension of the ITC, of which SunPower was aware at the time that the financial projections were issued.

66.    On May 5, 2016, the Company issued a press release entitled "SunPower Reports First Quarter 2016 Results."   Therein, the Company, in relevant part, stated

**Financial Outlook**
The company's second quarter fiscal 2016 non-GAAP guidance is as follows: revenue of $310 million to $360 million, gross margin of 12 percent to 14 percent, EBITDA of $0 to $25 million and megawatts deployed in the range of 360 MW to 385 MW. On a GAAP basis, the company expects revenue of $290 million to $340 million, gross margin of 10 percent to 12 percent and net loss of $90 million to $65 million. Second quarter 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting.

For fiscal year 2016, the company's non-GAAP financial guidance is unchanged. Non-GAAP expectations are as follows: revenue of $3.2 billion to $3.4 billion, gross margin of 14 percent to 16 percent, EBITDA of $450 million to $500 million, capital expenditures of $210 million to $260 million and gigawatts deployed in the range of 1.6 GW to 1.9 GW.

On a GAAP basis, the company now expects 2016 revenue of $2.8 billion to $3.0 billion, gross margin of 13 percent to 15 percent and net income of $0 million to $50 million. Fiscal year 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting.

67.   The foregoing statement was materially misleading for failing to disclose that SunPower did not factor into its projections for Fiscal Year 2016 the negative impact that the extension of the ITC and bonus depreciation would have on 2016 revenues. Specifically, Defendants failed to adjust SunPower's 2016 projections to take into account the PPA deal that had already fallen through in December 2015 due to the extension of the ITC, as well as renewed uncertainty and likely delayed or longer timelines relating to all other deals.

68.   The same day, on May 5, 2016, Defendants also held an earnings call to discuss the Company's first quarter 2016 results. During that call, Defendant Werner assured analysts and investors that the "key variables" of the 2016 guidance issued in November 2015 remained in place, and that "the solar fundamentals have never been better."

69.   The foregoing statement was materially misleading for failing to disclose that SunPower did not factor into its projections for Fiscal Year 2016 the negative impact that the extension of the ITC and bonus depreciation would have on 2016 revenues. Specifically, while commenting positively on the state of SunPower's "solar fundamentals," Werner concealed a major PPA deal had already fallen through in December 2015 due to the extension of the ITC, as well as renewed uncertainty and likely delayed or longer timelines relating to all other deals.

70.   On May 6, 2016, SunPower filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended April 3, 2016.  The Company's Form 10-Q was signed by Defendant Boynton, and reaffirmed the Company's financial guidance previously announced on May 5, 2016.

71.   The foregoing statement was materially misleading for failing to disclose that

SunPower did not factor into its projections for Fiscal Year 2016 the negative impact that the extension of the ITC and bonus depreciation would have on 2016 revenues. Specifically, Defendants failed to adjust SunPower's 2016 projections to take into account the PPA deal that had already fallen through in December 2015 due to the extension of the ITC, as well as renewed uncertainty and likely delayed or longer timelines relating to all other deals.

## DISCLOSURES AT THE END OF THE CLASS PERIOD

72. On August 9, 2016, SunPower issued a press release announcing its second quarter 2016 financial results. Therein, the Company identified multiple factors negatively impacting the Company's performance and forecasts for the second half of 2016:

> [W]e see a number of near-term industry challenges, primarily in our power plant segment, that we expect to impact our business and financial performance in the second half of 2016. The extension of the Investment Tax Credit, as well as the bonus depreciation credit, while beneficial to the long-term health of the industry, has reduced the urgency to complete new solar projects by the end of 2016, with many customers adopting a longer-term timeline for project completion. Additionally, near-term economic returns have deteriorated due to aggressive PPA pricing by new market entrants, including a number of large, global independent power companies. We are also seeing customer project IRRs rising in the near term as buyers have increased their hurdle rates due to industry conditions. Finally, the continued market disruption in the YieldCo environment has impacted our assumptions related to monetizing deferred profits.

73. Finally, the Company announced that as a result of the "challenges" described above, the it was negatively revising its fiscal year 2016 guidance:

> Financial Outlook
>
> As a result of the challenges described above, the company is updating its previously disclosed fiscal year 2016 guidance, as well as providing selected forecasts for fiscal year 2017.
>
> On a GAAP basis, the company now expects 2016 revenue of $2.8 billion to $3.0 billion, gross margin of 9.5 percent to 11.5 percent and net loss of $175 million to $125 million. Fiscal year 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting.
>
> The company's updated 2016 non-GAAP financial guidance is as follows: revenue of $3.0 billion to $3.2 billion, gross margin of 10.5 percent to 12.5 percent, EBITDA of $275 million to $325 million, capital expenditures of $225 million to $245 million and gigawatts deployed in the range of 1.45 GW to

1.65 GW.

For 2017, the company expects a GAAP net loss of $200 million to $100 million and EBITDA in the range of $300 million to $400 million.  The company expects that at the lower end of the guidance range, 2017 EBITDA would be generated almost entirely from the company's DG business and believes that with the announced realignment, it will be well positioned to capitalize on the long term growth potential in the global power plant market.

The company's third quarter fiscal 2016 GAAP guidance is as follows: revenue of $700 million to $800 million, gross margin of 14.5 percent to 16.5 percent and net loss of $5 million to net income of $20 million.  Third quarter 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting.  On a non-GAAP basis, the company expects revenue of $750 million to $850 million, gross margin of 16.5 percent to 18.5 percent, EBITDA of $115 million to $140 million and megawatts deployed in the range of 380 MW to 420 MW.

74.     SunPower also held an earnings call on August 9, 2016 to discuss the 2Q'16 results.  Defendant Werner stated:

In the power plant segment, concern around an ITC cliff drove a concerted burst of large scale project construction in the first half of 2016, tied to specific contractual milestones. However, extension of the ITC largely **removed the urgency for project construction in the second half of the year, temporarily shrinking the buyer universe, and decreasing both demand and pricing for projects completed in the second half of 2016 and 2017**.

75.     Defendant Boynton also discussed the impact of the ITC extension and bonus depreciation on the power plant segment:

The extension of the ITC in late 2015 significantly altered the completion timing and PPA pricing dynamics for certain second half 2016 projects, delaying project completion schedules and reducing expected PPA pricing.

Additionally, the inclusion of the bonus deprecation has reduced some of key customers' abilities to buy more projects as they have fully utilized their near-term tax equity capacity. This has also affected both project timing and pricing. **Specifically, we had one project where the PPA off-take was in late-stage negotiation and the customer exited after the ITC extension**.

**We then expected to sign a PPA for this project in the first half of 2016 for 2016 delivery. We still expect to sign a PPA for this project in 2016, but now expect 2017 delivery**. Together, we expect these factors related to ITC and bonus depreciation extension will impact our second half 2016 EBITDA by between $70 million to $90 million.

\* \* \* \* \*

As Tom detailed, we are seeing increased global competition in the power plant space as new entrants are bidding aggressive PPA prices. ***This more competitive PPA price environment impacted the final negotiated PPAs on certain projects we booked during the first half of 2016, and we believe that this will impact second half 2016 EBITDA by between $20 million to $30 million***.

\* \* \* \* \*

As Tom mentioned, ***we have modified our power plant sales process to expand the universe of buyers. In addition, we plan to partner with buyers for our projects earlier in the sales and financing cycle***. We expect this new process will increase competition and strengthen our relationship with the ultimate buyer.

76.     Analysts on the call were shocked and questioned when management realized the impact the extension of the ITC would have on its business:

<Q - Benjamin Joseph Kallo>: Okay. Number two. It seems like a whole lot of moving parts, just blind sided me, maybe not everyone, but definitely me, when you guys have publicly spoken over the past near couple of weeks, we didn't hear any kind of hint of this, we've heard about some in the marketplace, but nothing of this kind of size. Realignment. And so, just, can you just tell us, when this all came to light here?

<A - Tom H. Werner>: Yeah. This is Tom, and I'll take that question. So, in our prepared remarks, we talked about the factors that influence the power plant business and let me give you a little bit more color on those factors.

***So, we all know, that in December, the ITC was extended – I think what we talked about a little bit less was depreciation was part of that. Chuck mentioned in his remarks that [indiscernible] (36:05) on one of our projects, the counterparty stopped negotiating with us to close the PPA, when we were on a probable path to close a PPA with that customer.***

***As time went on, we had a replacement, customer for that project, <u>as we did on other projects</u>, those other projects actually booked, this project did not and we still expect it to book, but will not be in our P&L until next year. So, that project was directly impacted by the ITC/bonus depreciation extension***.

***As we got into the new year, buyers that were buying their projects, the impact of both the ITC and bonus depreciation became more apparent and materialized in what they were willing to pay for solar projects***. And as we guide into April, the third week of April, SunEdison went bankrupt and that was another factor that influence how buyers thought of "perceived risk of solar projects."

***The combination of those things meant that, when we were selling projects in***

*the last few months, the buyer universe had materially digested these changes, and their perceived risk and their price that we're willing to pay for projects that we closed over the last few months, two projects in particular*.

We're lower than what our plan was and those projects will be going through our P&L in the back half of the year. *And so, it's the evolution of our combination of ITC bonus depreciation, SunEdison bankruptcy, and then the other factors we mentioned on the phone, that materialized during the second quarter on a couple of our projects and pushed one project currently out of the year, and that's what happened.*

\* \* \* \* \*

<Q - Krish Sankar>: Yeah. Hi, it's Bank of America Merrill Lynch. I have two quick questions, one, Tom, not to beat up on the power plant business. Some of *these challenges of ITC extension and PPA pricing is not new news*, right. So, I'm just kind of trying to figure out the guidance downward shift, is it primarily on the margin, mainly due to a couple of SunPower specific projects, is a way to characterize it, or did PPA actually – pricing get exacerbated on the downside in the last three months? And then I had a follow-up.

<A - Tom H. Werner>: Yeah. I think, to be clear, *we have a site, had a buyer, or a PPA off-take. That negotiation failed in December directly correlated with the ITC. We had another buyer that may ultimately be – or another PPA off-take that may ultimately be the one that we sign for the project. And we still have confidence we will, but that has not gone as fast as we planned. That was part of the re-guide and that became clear as we got into the second quarter.*

*We were selling two projects in the second quarter, contracting to sell, two projects in the second quarter that had all of the factors that we mentioned in our narrative affect them. So, to the extent that it's SunPower-specific, it's that we had, did not have enough legacy PPAs to cover the year that we were perfecting new PPAs at the end of last year for this year.*

77.     On this news, which took the market by surprise, SunPower's stock price fell $4.47 per share, or 30%, to close at $10.31 per share on August 10, 2016, on unusually heavy trading volume.

78.     Numerous securities analysts noted their shock at this announcement, questioning management's credibility and focusing their attention on the fact that SunPower knew the extension of the ITC would cause a slow down in its business, and had stated that it had taken into account the slowdown in providing financial guidance.  Then on August 9, Sunpower admitted that they in fact did not take into account the known slowdown caused by the ITC extension in issuing financial guidance.

79.     Following this news, Credit Suisse issued a report titled "SunBurned" calling

management's credibility into question. "The company reduced 2H16 guidance ~40% and provided 2017 guidance well below investor expectations (54% below prior analyst day targets). The cuts are problematic in their own rights, but the bigger issue for the stock from here is management credibility and lack of apparent stability in the core business. There are a lot of moving parts to the realigned SunPower that will require strong execution in the coming quarters, and with the stock down 30% after hours it is clear to us that management needs to start by repairing its reputation. We believe in the long-term secular growth story underpinning the renewable space, and management's typically conservative approach, but find the unexpected guidance cut – attributed to factors that should have been apparent many months ago – to be disconcerting."

80.     An analyst covering SPWR at Avondale issued a report on August 10, 2010 stating, "SPWR's ahead-of-guidance 2Q results were rendered meaningless following management's 2H16 and FY17 guidance bomb and material strategy shift to restructure the Power Plant segment and focus almost exclusively on distributed generation."

81.     Guggenheim's August 10, 2016 report stated, "2016 guide-down was a surprise as we expected FY results to be mostly safe at this point."  It went on to note that "[g]iven the timing of the announcement that has startled the market, we think that management's credibility may be hurt in the near term." Guggenheim also noted that the majority of the guidance reduction was due to delayed PPA negotiations, which, as stated above, were due to the extension of the tax incentives.

82.     Janney's August 10, 2016 report discussed management's difficulty in explaining how the power plant business deteriorated so quickly:

A dismal forward outlook. SPWR is seeing weakness in the powerplant end market, due to variety of factors. On the conference call, the company cited timing and demand impacts from the ITC extension, investor IRR hurdle rates increasing, increased power purchase agreement (PPA) competition and negative industry impacts from the SunEdison bankruptcy as primary reasons for the decline in its powerplant business. Management was questioned on when it knew this end market was in decline, given the change in tone from the 1Q16 call.

* * * * *

Ratings and valuation aside, the call last night did not go well for several reasons. Management had trouble (in our opinion) articulating how the powerplant business deteriorated so quickly versus commentary on the 1Q16 call, and was even queried about the timeline of events (realization and restructuring). Certainly we're asking ourselves if the 2017 EBITDA guidance is achievable given management's changes to 2016 guidance in just a one quarter timeframe. We see value in the underlying business and substantial long term growth in the end markets, but the near term outlook is dismal and visibility poor.

83.    Although Defendants attempted to suggest that, in addition to the extension of the tax incentives, the revised guidance was due to other factors as well, in fact the extension of the tax incentives caused or exacerbated those problems, which resulted in the revenue miss.

84.    For instance, the issue of increased competition was massively exacerbated by the extension of the Investment Tax Credit, and the delayed project timelines that came along with it.  CW4, a Senior Project Manager from mid 2015 to October 2016, explained that early in CW4's tenure, SunPower's products were more expensive, but also more efficient, than their competitors.  However, during CW4's tenure, SunPower's competitors were able to make up considerable ground on the efficiency front, yet SunPower did not reduce its own prices to compensate.  Thus, as time went on, SunPower's product was less and less competitive.  The time pressure of the ITC was therefore beneficial to SunPower, because a longer time frame meant a longer opportunity for competitors to catch up.  Similarly, with respect to 8Point3, as mentioned in paragraph 57 above, the decrease in number of deals in 2016 made 8Point3's capital raising more difficult.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

85.    Werner's scienter can be inferred from the fact that, according to the 10-K that SunPower filed on February 17, 2016, and that Werner signed, "[w]e have incorporated into our financial planning and agreements with our customers certain assumptions regarding the future level of U.S. tax incentives, including the ITC and Cash Grant, which is administered by the U.S. Treasury Department ("Treasury") and provides cash grant payments in lieu of the ITC."  Werner elaborated on those assumptions in an analyst presentation and accompanying slide deck.  That presentation included the slide below:

1
2
3
4
5
6
7
8
9
10
11
12
13



14      86.     Werner specifically referenced this slide in his presentation.  As the above slide
15  shows, Werner was aware that the extension of the ITC could negatively impact 2016 demand.
16  Yet Werner failed to incorporate this reduced demand into the Company's long term projections.

17      87.     In reality, overall industry data that Werner relied upon turned out to be overly
18  pessimistic. The GTM Research projections in June of 2016, shown in the slide deck presented
19  to investors after the Class Period, on August 10, 2016, showed an improved outlook for 2016.

20
21
22
23
24
25
26
27
28



88.     Thus, if the Company really *had* included estimates as to the negative impact of the ITC extension on 2016 sales, it should have *underestimated* revenues in 2016, not overestimated them.

89.     Werner's scienter is further inferred from his statement during the Company's May 5, 2016 earnings call acknowledging that the ITC extension was likely to slow 2016 sales, pushing project timelines instead into 2017: "So the key variables from [guidance issued in] November remain in place. Where, what's new since November of course is the ITC extension, and if anything that moves business from 2016 to 2017, if there was a general trend caused by the ITC. What it does do more favorably, though it gives you a longer horizon to work with customers and importantly financiers. So I generally say and I've said this several times in various forums, the solar fundamentals have never been better."

90.     Werner's scienter can further be inferred from his knowledge, as he acknowledged in an earnings call dated August 10, 2016, that at least one major customer cancelled negotiations in December of 2015 upon the extension of the Investment Tax Credit.  In addition, Werner stated that "[a]s we got into the new year [2016], buyers that were buying their projects, the impact of both the ITC and bonus depreciation became more apparent and

materialized in what they were willing to pay for solar projects." Thus, Werner was aware at the beginning of 2016 that there was a slowdown in sales in 2016.

91.     Boynton's scienter can be inferred from the fact that, according to the 10-K that SunPower filed on February 17, 2016, and that Boynton signed, stated that "[w]e have incorporated into our financial planning and agreements with our customers certain assumptions regarding the future level of U.S. tax incentives, including the ITC and Cash Grant, which is administered by the U.S. Treasury Department ("Treasury") and provides cash grant payments in lieu of the ITC."

92.     Boynton's scienter can also be inferred from the fact that he was a participant in the earnings calls discussed in 85 to 91 above and was therefore aware of the projections that demand for solar projects would decline in 2016 due to the extension of the ITC as set forth in the slide at ¶87.

93.     SunPower's scienter can be inferred from Boynton and Werner's scienter.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired SunPower securities between February 17, 2016, and August 9, 2016, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

95.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SunPower's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of SunPower shares were traded publicly during the Class Period on the NASDAQ. As of August 5, 2016, SunPower had 138,150,656 shares of common stock outstanding. Record owners and other members of the

Class may be identified from records maintained by SunPower or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

97.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SunPower; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## **LOSS CAUSATION**

100.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SunPower's securities, by

publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about SunPower's business, operations, and prospects as alleged herein.

101. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SunPower's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

26. The market for SunPower's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, SunPower's securities traded at artificially inflated prices during the Class Period. On March 17, 2016, the Company's stock price closed at a Class Period high of $24.74 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SunPower's securities and market information relating to SunPower, and have been damaged thereby.

27.     During the Class Period, the artificial inflation of SunPower's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SunPower's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of SunPower and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

28.     At all relevant times, the market for SunPower's securities was an efficient market for the following reasons, among others:

(a)     SunPower stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, SunPower filed periodic public reports with the SEC and/or the NASDAQ;

(c)     SunPower regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     SunPower was followed by dozens of securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

(e)     SunPower an actively traded stock, with an average of 6.9% of SunPower stock traded per week during the class period.

29.    As a result of the foregoing, the market for SunPower's securities promptly digested current information regarding SunPower from all publicly available sources and reflected such information in SunPower's stock price. Under these circumstances, all purchasers of SunPower's securities during the Class Period suffered similar injury through their purchase of SunPower's securities at artificially inflated prices and a presumption of reliance applies.

30.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

31.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive

officer of SunPower who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

32.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

33.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SunPower's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

34.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SunPower's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

35.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SunPower's financial well-being and prospects, as specified herein.

36.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SunPower's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state

material facts necessary in order to make the statements made about SunPower and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

37.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

38.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SunPower's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

39.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SunPower's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired SunPower's securities during the Class Period at artificially high prices and were damaged thereby.

40.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that SunPower was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SunPower securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

41.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

42.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

43.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

44.     The Individual Defendants acted as controlling persons of SunPower within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

45.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

46.     As set forth above, SunPower and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

1  this action, including counsel fees and expert fees; and

2         (d)     Such other and further relief as the Court may deem just and proper.

3  <div align="center">**<u>JURY TRIAL DEMANDED</u>**</div>

4      Plaintiff hereby demands a trial by jury.

5

6  Dated:  October 17, 2017

7                        Respectfully submitted,

8                        **THE ROSEN LAW FIRM, P.A.**

9                        /s/ Jonathan Stern

10                        Laurence M. Rosen, Esq. (SBN 219683)
Jonathan Stern
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (213) 785-2610
Fax: (213) 226-4684
Email: lrosen@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: RProngay@glancylaw.com
       lglancy@glancylaw.com

Co-Lead Counsel for Plaintiffs and Class