**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (SBN 270796)
Kara M. Wolke (SBN 241521)
Christopher Fallon (SBN 235684)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim, Esq. (admitted *pro hac vice*)
Jonathan Stern, Esq. (admitted *pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Attorneys for Plaintiffs and the proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE SUNPOWER CORPORATION SECURITIES LITIGATION | Case No.:3:16-CV-4710-RS<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiffs Ricardo Manes, Padraig McGowan, James Nguyen, Kevin Korbaylo, and Jason Martinez ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by SunPower Corporation ("SunPower" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by SunPower; and (c) review of other publicly available information concerning SunPower.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired SunPower securities between February 17, 2016, and August 9, 2016, inclusive (the "Class Period"), and were damaged thereby (the "Class"). This action asserts claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants SunPower, Thomas H. Werner (SunPower's CEO), and Charles D. Boynton (SunPower's CFO).

2. SunPower is an energy company that delivers solar solutions to residential, commercial, and power plant customers. The Company's offerings purportedly include: solar module technology and solar power systems that are designed to generate electricity over a system life typically exceeding 25 years; integrated Smart Energy software solutions; installation, construction, and ongoing maintenance, and monitoring services; and financing solutions that provide customers a variety of options for purchasing or leasing solar products.

3. A major component of SunPower's business involves entering into Power Purchase Agreements with customers. Rather than sell solar panels to a user of electrical power directly, SunPower contracts to build a solar power plant, and to sell electricity to the commercial customer. Then, SunPower sells the contract to receive payment for the electricity to a financing partner.

4. Solar power plants built pursuant to such PPAs accounted for 55% of SunPower's

revenue in 2016, 42% of SunPower's revenue in 2015, and 67% of SunPower's revenue in 2014. And this massive share of the Company's revenue is generated through a very small number of very large PPA deals. For example, the Company's 2015 Form 10-K reveals that SunPower had a total of only ***six*** executed PPAs in 2015. Those projects were the Prieska in South Africa, Henrietta in California, Boulder in Nevada, Stanford in California, Hooper in Colorado, and Rio Bravo in California. Furthermore, of those six PPA deals, only three were newly-executed PPAs in 2015, while the other three were ongoing projects from 2014; the Company's 2014 Form 10-K reflects that the Prieska, Henrietta, and Hooper Solar Projects already had executed PPAs in 2014. The Company's 2016 Form 10-K similarly reveals that SunPower had a total of only ***five*** executed PPAs in 2016. Those projects were Boulder Solar Project II in Nevada, Iberdrola Gala in Oregon, El Pelicano in Chile, and Ticul and Guajiro in Mexico. Thus, each PPA is a major endeavor for SunPower, and the closing — or failure to close — of even a single PPA can have a material impact on the Company's financial performance.

5. For years, SunPower's business, including its Power Purchase Agreement business, benefitted from various government subsidies. One of those subsidies, the Investment Tax Credit, was set to expire at the end of 2016. This created a strong incentive, for both SunPower and its customers to complete any prospective Power Purchase Agreements in 2016. In November of 2015, SunPower issued 2016 guidance taking that into consideration. However, in December of 2015, Congress extended the Investment Tax Credit in perpetuity, removing the immediate incentive to complete deals in 2016. Immediately upon this announcement, one of SunPower's prospective customers that SunPower was negotiating a Power Purchase Agreement abruptly cancelled negotiations. As former SunPower employees report, and as Defendants themselves would only later admit, in early 2016 other prospective customers began slowing down, or pulling out of, negotiations as well. Nevertheless, Defendants assured investors that SunPower had considered the impact of the extension of the Investment Tax Credit and, despite the possibility that it could slow market demand in 2016, that SunPower's business was not only unaffected, but looked better than it had in November 2015 – despite the fact that, in reality,

SunPower had already lost one major PPA deal, and was experiencing difficulty in closing others and in maintaining pricing levels enjoyed before the ITC extension.

6. On August 9, 2016, SunPower issued a press release announcing its second quarter 2016 financial results. Therein, the Company disclosed the existence of several factors negatively impacting the Company's performance, including in part "customers adopting a longer-term timeline for project completion," "aggressive [Power Purchase Agreement ("PPA")] pricing by new market entrants," and "continued market disruption in the YieldCo environment." The Company explained that, as a result of these "challenges," it was substantially decreasing its fiscal year 2016 guidance—expecting a net loss of $175 million to $125 million, rather than the earlier-forecasted net income of $0 to $50 million.

7. SunPower also held an earnings call on August 9, 2016 during which Defendant Boynton explained that the extension of the ITC and bonus depreciation in late 2015 significantly altered the completion timing and PPA pricing dynamics for SunPower's projects:

> The extension of the ITC in late 2015 ***significantly altered the completion timing and PPA pricing dynamics*** for certain second half 2016 projects, ***delaying project completion schedules and reducing expected PPA pricing***.
>
> Additionally, the inclusion of the bonus deprecation has reduced some of key customers' abilities to buy more projects as they have fully utilized their near-term tax equity capacity. This has also affected both project timing and pricing. ***Specifically, we had one project where the PPA off-take was in late-stage negotiation and the customer exited after the ITC extension***.
>
> ***We then expected to sign a PPA for this project in the first half of 2016 for 2016 delivery. We still expect to sign a PPA for this project in 2016, but now expect 2017 delivery***. Together, we expect these factors related to ITC and bonus depreciation extension will impact our second half 2016 EBITDA by between $70 million to $90 million.[1]

8. On this news, SunPower's stock price fell $4.47 per share, or 30%, to close at $10.31 per share on August 10, 2016, on unusually heavy trading volume.

9. Throughout the Class Period, Defendants made materially false and/or misleading

[1] Unless otherwise noted, all bold/italic emphasis is added.

statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: that a substantial number of the Company's customers were adopting a longer-term timeline for project completion due to the extension of the tax credits, and that SunPower was aware of this, and that as a result, Defendants' statements about SunPower's business and operations were false and misleading.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, SunPower's principal executive offices are located within this Judicial District.

14. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15. Plaintiff Ricardo Manes, as set forth in the previously filed certification,

incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16. Plaintiff Padraig McGowan, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17. Plaintiff James Nguyen, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18. Plaintiff Kevin Korbaylo, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Plaintiff Jason Martinez, as set forth in the previously filed certification, incorporated by reference herein, purchased SunPower securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20. Defendant SunPower is a Delaware corporation with its principal executive offices located at 77 Rio Robles, San Jose, California 95134. SunPower's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "SPWR."

21. Defendant Thomas H. Werner ("Werner") was, at all relevant times, the President, Chief Executive Officer ("CEO"), and a Director of SunPower. Prior to joining SunPower, from 2001 to 2003, he served as CEO and Director of Silicon Light Machines, Inc., an optical solutions subsidiary of Cypress Semiconductor Corporation. From 1998 until 2001, Werner was vice president and general manager of the Business Connectivity Group of 3Com

Corp., a network solutions company, and between 1987 and 1995 he held a number of executive management positions at Oak Industries, Inc. He currently serves as a board member of Cree, Inc., Silver Spring Networks, Silicon Valley Leadership Group, and is a member of the Marquette University board of trustees. Werner holds a bachelor's degree in industrial engineering from the University of Wisconsin, Madison, a bachelor's degree in electrical engineering from Marquette University and a master's degree in business administration from George Washington University.

22. Defendant Charles D. Boynton ("Boynton") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of SunPower where he leads the company's treasury, project finance, investor relations, financial planning and accounting organizations. He also currently serves as Chairman and Chief Executive Officer of 8point3 Energy Partners. Previously, he was the company's vice president of corporate finance and corporate development, with global responsibility for finance, planning and analysis and leading strategic investments, joint ventures, and mergers and acquisitions. Prior to joining SunPower, from 2008 to 2010, Boynton was CFO for ServiceSource International, where he was responsible for all aspects of finance, accounting, legal and facilities. Boynton also held the position as CFO at Intelliden from 2004 to 2008, where he drove finance, legal, IT, human resources and professional services. Earlier in his career, Boynton held key financial positions at Commerce One, Inc., Kraft Foods, Inc. and Grant Thornton, LLP, and is a current member of the board of trustees of the San Jose Technology Museum of Innovation. Boynton was a certified public accountant, State of Illinois, and a Member FEI, Silicon Valley Chapter. He earned his MBA at Northwestern University and his Bachelor of Science in Business from Indiana University.

23. Defendants Werner and Boynton are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SunPower's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### A. SunPower's Business

24. SunPower is an energy company that delivers solar solutions to residential, commercial, and power plant customers. The Company's offerings include: solar module technology and solar power systems that are designed to generate electricity over a system life typically exceeding 25 years; integrated Smart Energy software solutions; installation, construction, and ongoing maintenance, and monitoring services; and financing solutions that provide customers a variety of options for purchasing or leasing solar products.

25. SunPower also has a 40.7% ownership stake in 8point3 Energy Partners LP ("8point3"), a joint Yieldco vehicle formed by the Company and First Solar, Inc. ("First Solar") to own, operate and acquire solar energy generation assets. 8point3 has a right of first offer ("ROFO") agreement with SunPower on interests in the Company's solar energy projects that are currently contracted or are expected to be contracted before being sold by the Company to other parties.

26. In addition to selling systems to commercial, residential, and power plant customers, SunPower also enters into contracts, called Power Purchase Agreements (or "PPAs"), whereby SunPower installs solar panels for the customer and agrees to sell power generated by those panels to the customer. SunPower then sells the installed solar system to an investor or financing company, and the customer pays that investor or financing company for the power

over an extended period of time based on the energy consumed.

**B. <u>The Impact of the Solar Investment Tax Credit (or "ITC")</u>**

27. For many years, SunPower has benefitted from a federal government subsidy for renewable energy called the "Investment Tax Credit" (or "ITC"), which entitles purchasers to receive a tax credit for a percentage (currently 30%) of the cost of installing solar panels – thereby incentivizing purchasers and driving sales.

28. Under a PPA, the developer (here SunPower) arranges for the design, permitting and financing of the solar system on the host customer's property. The developer sells the energy created by the system to the host customer at a fixed rate that is typically lower than what is charged by the local utility. The lower price permits the customer to begin saving upon installation, while the developer receives income as well as the Investment Tax Credit.

29. SunPower utilized the tax benefits associated with its projects to develop investment opportunities that are referred to as "tax equity financing" structures. A tax equity financing structure refers to when an investor who purchases an interest in a product receives not only the cash flows from the investment, but also the financial benefits of receiving tax credits or tax deductions. Thus, when SunPower sold Power Purchase Agreements to third parties, it was offering not only "cash equity" – an interest in cash flows, but "tax equity" – the prospect of tax benefits. However, as Defendant Boynton explained on the November 2015 Analyst Day that when a project is sold to 8point3 rather than a third party tax equity investor, "SunPower recognized the tax benefit and 8point3 recognized the cash equity benefit."

30. In addition to the Investment Tax Credit, Congress had for many years allowed for accelerated depreciation known as "bonus depreciation." The 50% bonus depreciation allowed system owners to claim depreciation of half of their solar facility after it is placed in service. By receiving the right to take accelerated depreciation, companies are able to take tax deductions in earlier years, which is typically financially beneficial.

31. The ITC and bonus depreciation were set to expire at the end of 2016, which, according to Defendants, created a strong incentive for potential customers to complete deals in

2016. SunPower's financial planning operated under the assumption that the ITC would expire at the end of 2016.

**C. <u>Defendants Guide Toward Growth in 2016</u>**

32. On November 12, 2015, SunPower held an Analyst Day presentation where Defendant Werner announced the Company was "back to growth."

33. The Company issued financial projections for the 2016 fiscal year that relied in part on a planned run-up in sales in 2016, as customers would supposedly rush to purchase solar systems in advance of the end-of-2016 Investment Tax Credit expiration. Werner announced: "For fiscal year 2016, the company expects non-GAAP revenue of $3.3 billion to $3.5 billion, gross margin of 13 percent to 15 percent, EBITDA of $515 million to $565 million, capital expenditures of $210 million to $240 million and gigawatts (GW) deployed in the range of 1.7 GW to 2.0 GW. On a GAAP basis, the company expects revenue of $1.2 billion to $1.4 billion, gross margin of 16 percent to 18 percent and net loss of $415 million to $365 million."

34. Defendant Boynton discussed the Company's 2016 outlook:

> And I want to point out that North American megawatts are growing 30%. So we're seeing really strong residential volume growth in the U.S. ahead of the ITC step-down. We're seeing commercial growth of 65% in megawatts deployed, so very significant commercial growth. And then in the power plant at a midpoint of 1.1, an ***81% increase in the overall volume of megawatts deployed for power plants***.

35. Despite the rosy 2016 guidance, Defendant Boynton acknowledged 2017 would see decreased demand in North America *following* the expiration of the Investment Tax Credit, yet suggested the Company's success in international markets would offset it:

> So if we now look overall at our global expansion. Our business is becoming more global. We see a significant increase in 2017 and you'll see intentionally our shift, the chart is in the right, you'll see intentionally our shift from Americas to our international markets. And really there's sort of a polling effect quite frankly from 2017 to 2016 to capitalize on the value of the ITC.

**D. <u>The ITC and Bonus Depreciation Are Extended in December 2015; While Analysts Question "Demand Challenges," Defendants Convince the Market that SunPower Is "Bucking the Trend"</u>**

36. Congress renewed the ITC in December of 2015, maintaining a 30% credit until 2019 for residential and commercial projects, which would gradually decline to 10% for commercial projects and 0% for residential projects after 2021. In concert with the ITC extension, Congress extended 50% bonus depreciation for property placed in service before 2018, declining in subsequent years to 40% in 2018 and 30% in 2019.

37. Although the extension of the Investment Tax Credit and bonus depreciation would be, in the long term, beneficial to the solar industry, it removed the urgency for 2016 projects, which was fundamental to the SunPower's business planning and factored into 2016 guidance.

38. Defendants felt the impact of this extension immediately, when one prospective customer terminated negotiations in late 2015 immediately upon and due to announcement of the tax credit extension. In addition, by early 2016, other customers began to delay negotiations.

39. On February 17, 2016, the Company issued its financial results for the 4th quarter and fiscal year 2015, which stated in part:

> In the power plant segment for the fourth quarter, we successfully met our project commitments, added to our pipeline and further built out our U.S. HoldCo asset base, improving visibility for drop downs to 8point3 Energy Partners in 2016. Specifically, our 135-megawatt (MW) Quinto project achieved commercial operation during the quarter and is now generating energy for 8point3 Energy Partners. Our quarterly power plant segment results benefited from strong Engineering, Procurement and Construction (EPC) execution as our 50-MW Hooper project for Xcel was completed a quarter ahead of schedule. We also commenced construction on our 100-MW project for NV Energy in Nevada and recently dedicated our second 15-MW project at Nellis Air Force base. Going forward, ***we see significant upside opportunity in the U.S. power plant market as the recent extension of the U.S. federal solar investment tax credit (ITC) provides a sustainable, long term market structure to support further growth***.
>
> …
>
> **Financial Outlook**
>
> Given ***strong global demand*** as well as a favorable policy environment, the company remains very confident that it can achieve its long term strategic and

> financial goals by leveraging its flexible business model to drive sustainable growth. With the recent extension of the ITC, the company anticipates increasing its investment in the United States while maintaining its global go-to-market focus.

40. Thus, despite the extension of the Investment Tax Credit and bonus depreciation, the removal of the incentive to complete deals by 2016, and the adverse incentives that the extension of bonus depreciation had on utility projects, Defendants continued to assert that demand was strong, while omitting any reference to the near-term implications of, and risks to demand posed by, ITC extension. Indeed, Defendants were aware that the extension of the credit not only had the potential to, but in fact did, cause customers to delay closing deals due to the removal of pressure to complete those deals by the end of 2016 and the adverse incentives that the extension of bonus depreciation had on utility projects.

41. In an analyst presentation that same day, Defendant Boynton assured an analyst that demand for the Company's projects remained strong:

> **<Q - Krish Sankar>**: Yeah. Hi. It's Bank of America Merrill Lynch. Thanks for taking my questions. I have two of them. Let me ask them upfront. First one, either Chuck or Tom, can you talk a little bit about the tax equity availability across the different market segments like commercial, resi, power plants in the U.S. ….
>
> **<A - Charles D. Boynton>**: Thanks, Krish. I'll go first and address tax equity. So we see a very strong tax equity market for SunPower investors who like to work with SunPower because of our reputation, our balance sheet, the strength. To answer your question on residential, we've recently closed a new fund that will provide us capacity we think through the year. And so, we're very excited about this new fund and it's sort of in line with the prior funds that we've done with similar investors.
>
> On commercial, we finance those many different ways. There is a lot of demand from investors. Recently, Wells Fargo financed a couple commercial projects. They're a great partner. And then finally on utility scale, there is, we think, still a strong demand in utility for our projects. If we sell to 8point3, then we bring in a pure cash equity or tax equity investor. And if we do other structures, then it could be a different deal, but there's very strong demand for our projects.

42. Defendants' efforts to convince analysts and the investing public that they were continuing to see strong demand despite the extension of the tax credits were successful. Following the earnings call, Credit Suisse issued a report noting that SunPower was not

experiencing the demand challenges that were impacting its competitors as a result of the extension of the tax credits. It stated, “While the market seems to fear demand challenges and more difficult access to capital across the solar space, SunPower is bucking the trend and remains in a healthy position with a clean balance sheet and an execution track record that is enabling growth.”

43. Similarly, on February 18, 2016, J.P. Morgan issues a report stating, “SPWR cited robust demand across segments. MW held on the balance sheet grew to 1,067, up from 1,002 at 3Q, including projects slated for dropping into 8point3 Energy that are not yet complete. The global pipeline grew to over 14GW, expanding q/q in all geographies.”

44. On May 5, 2016 SunPower held an earnings call to discuss its first quarter 2016 financial results. Defendant Werner touted “continued strong demand” stating:

> In summary, Q1 was a solid quarter for the company, as we built our HoldCo assets, expanded our backlog and pipeline, especially in Mexico and Chile, increased our DG market share, signed an exclusive co-marketing agreement with AT&T and progressed on our cost and technology roadmaps. We’re also pleased with the construction warehouse facility showing our preferential access to low cost capital. We see continued strong demand for our solar solutions and are particularly excited about the momentum we are seeing with our portfolio of complete solutions, Oasis, Helix and Equinox.

45. Analysts participating on the call inquired about the demand for projects:

> <Q - Tyler Charles Frank>: Great. Thanks. A quick follow-up. ***Can you discuss what you’re seeing just in the general marketplace*** not for 8point3, but ***for third-party buyers, just the overall demand for projects right now. Has there been any slowdown or any pickup***?

> <A - Charles D. Boynton>: I’d say, ***it’s consistent***. This is Chuck. It’s consistent with where we were last quarter. ***We have this strong demand for our projects from third-party buyers and we’re in negotiations right now to close several deals, so we’re feeling that it’s consistent with where we were last quarter***.

46. J.P. Morgan also issued a report on May 5, 2016 noting that “Management commentary remains optimistic with near-term growth driven by the distributed generation business along with projects slated for sale during 2H. Demand remains robust, and the company views the struggles of other competitors as an opportunity to acquire projects that can add to

visibility."

47. On May 6, 2016, Morgan Stanley issued a report, stating:

> **Positive commentary around demand and financing availability.** Management noted a robust order rate for its new Equinox product in the residential segment, its Helix product is being rolled out successfully in the commercial segment, and SunPower continues to see strong demand from third party buyers in the utility segment. The company noted tax equity remains widely available, with very strong demand from tax equity investors. Management also stood behind its 2017 outlook provided in November 2015, highlighting its diversification across markets and segments, new product rollouts, and extension of the ITC that would help SPWR weather any isolated market issues.
>
> **There is flexibility around monetization of assets earmarked for 8point3.** Though several large power plant projects that are on track for 2H16 completion were earmarked for dropdown to 8point3, SunPower noted it has the option to sell these assets to third parties if the capital markets are not accessible to the yieldco. SPWR would replace the projects in 8point3's ROFO list with other future development assets, allowing the company to be patient and wait for a more supportive equity market backdrop before dropping down large assets.

48. Barclays issued a report on May 9, 2016 revising its 2016-2018 estimates, which stated, "We expect the US utility-scale segment to face a y/y decline in 2017 ***following robust demand in 2016***... The 2017 y/y expected decline is due to ***strong ITC driven demand in 2016E*** and uncertainty over the EPA's Clean Power Plan likely driving utilities to delay investment until the regulatory timeline is clearer."

49. On July 21, 2016 Credit Suisse issued a report prior to SunPower releasing its Second Quarter 2016 financial results, stating, "Bottom line - don't expect any deviations from annual guidance, focus on pricing pressures and 2017: We expect Q2 results to be in line with estimates (like Q1) given the year is 2H weighted. Any deviations would more likely be the result of project timing and should not impact 2016 guidance. Focus should be on 2H16 deliveries (for any signs of delay), impact of industry oversupply and pricing pressures, and any clues on 2017 earnings power beyond contracted backlog."

50. Guggenheim issued a report on July 27, 2016 announcing that it was upgrading SPWR to BUY. It stated:

> Our view on the valuation has not changed; however, at these levels and given

> recent developments, we believe the shares of SPWR have a compelling risk-reward profile. First, the concerns around 2H16 results that were keeping us on the sidelines are now alleviated, and we think this should remove the overhang on the shares. As a reminder, due to its project delivery schedule, SPWR's management expected to generate over 90% of 2016 EBITDA in 2H'16. Due to improved capital market conditions and recent developments at 8Point3 (CAFD, NEUTRAL, $17.14), we view these deliveries funding as substantially derisked at this stage. Second, we think that the sentiment around SPWR, and solar in general, is nearing its trough. We understand concerns around capacity additions and PPA pricing, but we think that SPWR will stay ahead of the curve. Specifically, we see ~8-10% annual system cost reductions in 2016-2018; however, SPWR is targeting 20-30% cost reductions by 2018. We think that these efficiency gains, strong bookings (SPWR has booked 800Mw of new projects YTD, and we expect it to participate in additional auctions in 2H) as well as the roll-out of P-Series in 2017 will help turn the sentiment around.

51. J.P. Morgan issued a report on August 5, 2016 just days before SunPower announced its 2Q'16 financial results, noting that "While we believe the company is well positioned for 2H16 owing to project timing, investor focus will likely be on visibility into FY17 owing to an industry-wide post-ITC slowdown." The report also stated, "Expect FY16 guidance to be reiterated owing to visibility into 2H projects." The "Investment Thesis" stated,

> SPWR is a best-in-class polysilicon-based PV solar solutions provider. The firm entered 2016 operating at 100% utilization of available capacity with strong growth prospects attached to a global pipeline of utility-scale projects and growing demand for rooftop solutions in the N. American and Japanese end markets. We think the firm's longer term prospects are buoyed by SPWR's industry-leading cell efficiency and system-level cost of production. SPWR also benefits from being able to partner with Total, globally, and particularly in regions where the levelized cost of solar is competitive with conventional electricity generation. We view SPWR as a core holding in a solar stock portfolio.

**E. <u>Defendants Deliberately Concealed the Impact of the ITC and Bonus Depreciation Extension During the Class Period</u>**

52. As detailed above, throughout the first half of 2016, Defendants steadfastly denied – in face of repeated analyst inquiry – that the ITC and bonus depreciation extension would cause any negative impact upon 2016 sales. Instead, Defendants were able to convince analysts and investors alike that, despite the ITC and bonus depreciation extension, demand remained strong and sales were unaffected.

53. Contrary to this rosy public picture, however, Defendants were well aware that the extension of the ITC and bonus depreciation was, in fact, reducing 2016 sales and revenue. Defendants revealed on the August 9, 2016 earnings call that immediately after the extension of the Investment Tax Credit, in December of 2015, a prospective customer with whom SunPower was negotiating a Power Purchase Agreement immediately terminated negotiations.

54. In addition, by the first quarter of 2016, SunPower had difficulty closing additional deals. According to FE1, who was a Senior Director of EPC Project Development for 18 months ending in October of 2016, by February or March of 2016 it had become apparent that many prospective customers were slow to sign and finalize deals. FE1 stated that following the ITC extension, customers were slow to return calls or answer emails, and SunPower executives were "hanging in there" hoping three or four deals would close that would have otherwise closed had the ITC not been extended. FE1 learned this because he worked closely with the business development and finance teams, that were working on these sales. FE1 reported that several large deals lost momentum after the Investment Tax Credit was extended and customers were "dragging feet" and milestone dates were missed. FE1 explained that leading into the end of 2015, there was an urgency behind deals because of the time limit on the ITC; FE1 explained that when there is a shorter time frame to work with, the deal moves quickly and the customer does not have as much time to seek out other bids. FE1 explained that prior to the ITC extension, this had worked to SunPower's advantage since the Company generally had higher pricing than its competitors. By contrast, following the ITC extension, the urgency fell off, as did SunPower's advantage therefrom, resulting in softening demand and slowing sales.

55. FE2 was a contract Project Scheduler at SunPower from October 2015 until March 2016. FE2 reported to Schedule Manager Steve Long [FE2 was uncertain of the last name] who reported to the Project Controls Manager, Jordan [last name unknown]. In this position, FE2 was responsible for tracking the scheduling and costs involved in projects. FE2 tracked costs and conducted weekly schedule meetings with the project management team to ensure that the scheduled outline in the PPA was being adhered to. FE2 was assigned to three

power plant projects during FE2's tenure at SunPower: Rosemont, located in/near Death Valley; Boulder, located in Nevada outside of Las Vegas; and Henrietta, located near Bakersfield, CA. FE2 indicated SunPower hired FE2 as a contractor because the Company expected a lot of project work due to the ITC expiration, yet when the ITC was extended there was not as much work and FE2's hours were reduced causing FE2 to leave the Company. FE2 indicated that in approximately June 2016, there was a layoff at SunPower and FE2's manager informed FE2 that the manager and two other Schedulers were laid off.

56. FE2 stated that the projects FE2 worked on began slowing down and not meeting milestones. FE2 stated that the second phase of the Rosemont power plant project was falling behind the milestones set by the PPA. FE2 stated that Rosemont was supposed to have a third phase, but FE2 doubted it would be constructed. FE2 believed Southern California Edison was the purchaser of the energy or PPA holder for the Rosemont project. FE2 was trained on the Henrietta project, and while FE2 did not work directly on that project, FE2 visited the site to meet with general contractors and project management. In this regard, FE2 was made aware that Henrietta was also not on schedule.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

57. The Class Period begins on February 17, 2016. On that day, SunPower issued a press release entitled, "SunPower Reports Fourth Quarter and Fiscal Year 2015 Results." Therein, the Company, in relevant part, stated:

> In the power plant segment for the fourth quarter, we successfully met our project commitments, added to our pipeline and further built out our U.S. HoldCo asset base, improving visibility for drop downs to 8point3 Energy Partners in 2016. Specifically, our 135-megawatt (MW) Quinto project achieved commercial operation during the quarter and is now generating energy for 8point3 Energy Partners. Our quarterly power plant segment results benefited from strong Engineering, Procurement and Construction (EPC) execution as our 50-MW Hooper project for Xcel was completed a quarter ahead of schedule. We also commenced construction on our 100-MW project for NV Energy in Nevada and recently dedicated our second 15-MW project at Nellis Air Force base. Going forward, ***we see significant upside opportunity in the U.S. power plant market as***

> ***the recent extension of the U.S. federal solar investment tax credit (ITC) provides a sustainable, long term market structure to support further growth***.
>
> …
>
> **Financial Outlook**
>
> Given strong global demand as well as a favorable policy environment, the company remains very confident that it can achieve its long term strategic and financial goals by leveraging its flexible business model to drive sustainable growth. With the recent extension of the ITC, the company anticipates increasing its investment in the United States while maintaining its global go-to-market focus.

58. The foregoing statement was misleading because it misrepresented the then-current state of demand and failed to disclose that demand had in fact declined immediately following the extension of the ITC in December 2015. Specifically, Sunpower lad lost at least one major PPA deal in December 2015 due to the extension of the ITC, and insiders report that by early 2016 other customers had begun to slow down, or even cancel, negotiations. As Defendants themselves would only later admit, the Company was forced to find "replacement" customers on a number of other projects where buyers backed out in the wake of the ITC extension. Because Defendants claimed that the ITC presented a "significant upside opportunity," their omission of the negative impact the ITC extension was having on near-term demand in 2016 was materially false and misleading.

59. On the February 17, 2016 earnings call discussing the financial results for Q4'15 Defendant Werner stated, "In summary, Q4 was a great quarter for the company as we executed on our project commitments, expanded our pipeline and progressed on our cost and technology roadmaps. ***We see continued strong global demand and are excited about*** the launch of our new products and ***the growth of our global project pipeline***." Discussing the power plant segment, Defendant Werner touted the Company's global pipeline, noting "Our global pipeline currently exceeds 14 gigawatts, with expansion in all major geographies. In the Americas, our pipeline is over 4 gigawatts, and we expect this number to further increase to reflect the impact of the ITC extension." Defendant Werner concluded, "***Given strong global demand and the favorable policy environment, we remain confident in achieving our long-term strategic and financial***

***goals***."

60. The foregoing statement was misleading because it misrepresented the then-current state of demand and failed to disclose that demand had in fact declined immediately following the extension of the ITC in December 2015. Specifically, Sunpower lad lost at least one major PPA deal in December 2015 due to the extension of the ITC, and insiders report that by early 2016 other customers had begun to slow down, or even cancel, negotiations. As Defendants themselves would only later admit, the Company was forced to find "replacement" customers on a number of other projects where buyers backed out in the wake of the ITC extension. Because Defendants claimed that Sunpower was experiencing "strong global demand" and a "favorable policy environment," their omission of the negative impact the ITC extension was having on near-term demand in 2016 was materially false and misleading.

61. Defendant Boynton similarly assured an analyst on the call that there was strong demand for the Company's projects:

> **<Q - Krish Sankar>**: Yeah. Hi. It's Bank of America Merrill Lynch. Thanks for taking my questions. I have two of them. Let me ask them upfront. First one, either Chuck or Tom, can you talk a little bit about the tax equity availability across the different market segments like commercial, resi, power plants in the U.S. ….
>
> **<A - Charles D. Boynton>**: Thanks, Krish. I'll go first and address tax equity. So we see a very strong tax equity market for SunPower investors who like to work with SunPower because of our reputation, our balance sheet, the strength. To answer your question on residential, we've recently closed a new fund that will provide us capacity we think through the year. And so, we're very excited about this new fund and it's sort of in line with the prior funds that we've done with similar investors.
>
> On commercial, we finance those many different ways. There is a lot of demand from investors. Recently, Wells Fargo financed a couple commercial projects. They're a great partner. ***And then finally on utility scale, there is, we think, still a strong demand in utility for our projects***. If we sell to 8point3, then we bring in a pure cash equity or tax equity investor. And if we do other structures, then it could be a different deal, but ***there's very strong demand for our projects***.

62. The foregoing statement was misleading because it misrepresented the then-current state of demand and failed to disclose that demand had in fact declined immediately following the extension of the ITC in December 2015. Specifically, Sunpower lad lost at least

one major PPA deal in December 2015 due to the extension of the ITC, and insiders report that by early 2016 other customers had begun to slow down, or even cancel, negotiations. As Defendants themselves would only later admit, the Company was forced to find "replacement" customers on a number of other projects where buyers backed out in the wake of the ITC extension. Because Defendants claimed that the Company was experiencing "very strong demand," their omission of the negative impact the ITC extension was having on near-term demand in 2016 was materially false and misleading.

63. On February 19, 2016, SunPower filed its Annual Report with the SEC on Form 10-K for the fiscal year ended January 3, 2016. The Company's Form 10-K was signed by Defendant Boynton, and stated that "In late fiscal 2015, the U.S. government enacted a budget bill that extended the solar commercial investment tax credit (the "Commercial ITC") under Section 48(c) of the Internal Revenue Code of 1986 (the "IRC") and the individual solar investment tax credit under Section 25D of the IRC (together with the Commercial ITC, the "ITC") for five years, at rates gradually decreasing from 30% through 2019 to 22% in 2021. After 2021, the Commercial ITC is retained at 10%. We also saw other recent developments that contributed to a favorable policy environment, including (i) a significant focus on reducing world-wide carbon emissions through such events as the COP21 sustainable innovation forum held in Paris and the announcement of the Clean Power Plan in the United States, and (ii) domestic policy measures such as the extension of bonus depreciation and approval of California Net Metering 'NEM 2.0.' ***We believe these factors will strengthen demand for our products in all three business segments in U.S. and global markets*** and provide us an opportunity to expand our suite of energy solutions and complement our strong, existing core business."

64. The foregoing statement was misleading because it misrepresented the then-current state of demand and failed to disclose that demand had in fact declined immediately following the extension of the ITC in December 2015. Specifically, Sunpower lad lost at least one major PPA deal in December 2015 due to the extension of the ITC, and insiders report that by early 2016 other customers had begun to slow down, or even cancel, negotiations. As

Defendants themselves would only later admit, the Company was forced to find "replacement" customers on a number of other projects where buyers backed out in the wake of the ITC extension. Because Defendants claimed that there was "strengthen[ing] demand" for Sunpower's products, their omission of the negative impact the ITC extension was having on near-term demand in 2016 was materially false and misleading.

65. On May 5, 2016 SunPower held an earnings call to discuss its first quarter 2016 financial results. Defendant Werner touted "continued strong demand" stating:

> In summary, Q1 was a solid quarter for the company, as we built our HoldCo assets, expanded our backlog and pipeline, especially in Mexico and Chile, increased our DG market share, signed an exclusive co-marketing agreement with AT&T and progressed on our cost and technology roadmaps. We're also pleased with the construction warehouse facility showing our preferential access to low cost capital. We see ***continued strong demand*** for our solar solutions and are particularly excited about the momentum we are seeing with our portfolio of complete solutions, Oasis, Helix and Equinox.

66. In response to a specific analyst inquiry about demand for SunPower's projects and whether there was any slowdown, Boynton insisted that SunPower was experiencing no slowdown in demand, that demand was "strong" from third-party buyers (*i.e.*, PPAs) and "consistent" with the previous quarter:

> <Q - Tyler Charles Frank>: Great. Thanks. A quick follow-up. Can you discuss what you're seeing just in the general marketplace not for 8point3, but for third-party buyers, just the overall demand for projects right now. Has there been any slowdown or any pickup?
>
> <A - Charles D. Boynton>: I'd say, it's consistent. This is Chuck. It's consistent with where we were last quarter. ***We have this strong demand for our projects from third-party buyers and we're in negotiations right now to close several deals, so we're feeling that it's consistent with where we were last quarter***.

67. The foregoing statements ¶¶65-66 were misleading because it misrepresented the then-current state of demand and failed to disclose that demand had in fact declined immediately following the extension of the ITC in December 2015. Specifically, Sunpower lad lost at least one major PPA deal in December 2015 due to the extension of the ITC, and insiders report that by early 2016 other customers had begun to slow down, or even cancel, negotiations. As

Defendants themselves would only later admit, the Company was forced to find “replacement” customers on a number of other projects where buyers backed out in the wake of the ITC extension. Because Defendants claimed that there was “strong demand” for Sunpower’s products and that the Company was “consistent with where we were last quarter,” their omission of the negative impact the ITC extension was having on near-term demand in 2016 was materially false and misleading.

68. Boynton also responded to an analyst question on the 1Q’16 earnings call about “how the tax equity availability across the different market segments in the U.S. is currently” which was a major concern because many investors had already maximized their position in anticipation of the ITC expiration. Boynton stressed the supposedly strong state of demand for SunPower’s projects in each segment:

> Regarding your question on tax equity across the various markets, with residential we closed one deal at the beginning of this year. We’ll probably close one more this year. We’ve got strong demand and multiple people that are interested in this deal, think about that midyear to third quarter. On the commercial side, we do lots of commercial tax equity financings. ***There is very, very strong demand*** and many, many great banks that we work with. There, as you know, we do sell leasebacks and partnership flips, and ***there is very, very strong demand for our commercial business***.
>
> And then the utility scale, these are larger transactions and there again strong demand. Some of those deals are 100% sales to strategics, others are the 51%, 49% structure that would be sort of I’d say friendly drops to 8point3 or others. And there, ***we’re seeing a strong demand on the utility side***.

69. The foregoing statement was misleading because it misrepresented the then-current state of demand and failed to disclose that demand had in fact declined immediately following the extension of the ITC in December 2015. Specifically, Sunpower lad lost at least one major PPA deal in December 2015 due to the extension of the ITC, and insiders report that by early 2016 other customers had begun to slow down, or even cancel, negotiations. As Defendants themselves would only later admit, the Company was forced to find “replacement” customers on a number of other projects where buyers backed out in the wake of the ITC extension. Because Defendants claimed that there was “strong demand” for Sunpower’s

products, their omission of the negative impact the ITC extension was having on near-term demand in 2016 was materially false and misleading.

70. Defendant Werner also addressed declining PPA pricing on the call:

> What we see is what is very public is the utility scale tenders and of course we like probably a lot of solar companies have plotted PPA pricing over time and it would be fair to say that the forward pricing continues and that's great for our customers. I think we've crossed grid parity in a lot of the world that's therefore an increasingly international business, because more and more countries will benefit from low cost solar. We of course just won 500 megawatts in Mexico, 100 megawatt project started in Chile. So we have a handful of countries that we're particularly focused on in self development and while staying on the cost down trajectory such that that can still be good business for us. That business will evolve and there'll be ancillary services added to that business. So it won't exclusively be a PPA pricing business.

71. The foregoing statement was misleading because, in reality, declining PPA prices were having a significant impact on SunPower's business and its international business had not insulated it from the declines in PPA pricing which were impacting the rest of the market.

72. On May 6, 2016, SunPower filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended April 3, 2016. The Company's Form 10-Q was signed by Defendant Boynton, and stated:

> We remain focused on each of our three business segments. ***We believe that our key growth areas will be in our U.S. market in our Residential business and in emerging markets and in our Commercial and Power Plant businesses.*** We plan on continuing to expand our business in growing and sustainable markets, including Chile, Mexico, Turkey, South Africa, China, and the Middle East. We expect to grow our Power Plants business with investments in project development pipelines and in conjunction with our HoldCo strategy of retaining development projects on our balance sheet for longer periods of time in order to optimize the economic value that we receive at the time of sale. We are also working to expand our global components sales capabilities and international commercial opportunities.

73. The foregoing statement was misleading because it misrepresented the then-current state of demand and failed to disclose that demand had in fact declined immediately following the extension of the ITC in December 2015. Specifically, Sunpower lad lost at least one major PPA deal in December 2015 due to the extension of the ITC, and insiders report that

by early 2016 other customers had begun to slow down, or even cancel, negotiations. As Defendants themselves would only later admit, the Company was forced to find "replacement" customers on a number of other projects where buyers backed out in the wake of the ITC extension. Because Defendants claimed that the US market was a "key growth area" for Sunpower's products, their omission of the negative impact the ITC extension was having on near-term demand in 2016 was materially false and misleading.

## DISCLOSURES AT THE END OF THE CLASS PERIOD

74. On August 9, 2016, SunPower issued a press release announcing its second quarter 2016 financial results. Therein, the Company identified multiple factors negatively impacting its performance:

> [W]e see a number of near-term industry challenges, primarily in our power plant segment, that we expect to impact our business and financial performance in the second half of 2016. ***The extension of the Investment Tax Credit, as well as the bonus depreciation credit, while beneficial to the long-term health of the industry, has reduced the urgency to complete new solar projects by the end of 2016***, with many customers adopting a longer-term timeline for project completion. Additionally, ***near-term economic returns have deteriorated due to aggressive PPA pricing*** by new market entrants, including a number of large, global independent power companies. We are also seeing customer project IRRs rising in the near term as buyers have increased their hurdle rates due to industry conditions. Finally, the continued market disruption in the YieldCo environment has impacted our assumptions related to monetizing deferred profits.

75. Finally, the Company announced that as a result of the "challenges" described above, it was negatively revising its fiscal year 2016 guidance:

> Financial Outlook
>
> As a result of the challenges described above, the company is updating its previously disclosed fiscal year 2016 guidance, as well as providing selected forecasts for fiscal year 2017.
>
> On a GAAP basis, the company now expects 2016 revenue of $2.8 billion to $3.0 billion, gross margin of 9.5 percent to 11.5 percent and net loss of $175 million to $125 million. Fiscal year 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting.
>
> The company's updated 2016 non-GAAP financial guidance is as

> follows: revenue of $3.0 billion to $3.2 billion, gross margin of 10.5 percent to 12.5 percent, EBITDA of $275 million to $325 million, capital expenditures of $225 million to $245 million and gigawatts deployed in the range of 1.45 GW to 1.65 GW.
>
> For 2017, the company expects a GAAP net loss of $200 million to $100 million and EBITDA in the range of $300 million to $400 million. The company expects that at the lower end of the guidance range, 2017 EBITDA would be generated almost entirely from the company's DG business and believes that with the announced realignment, it will be well positioned to capitalize on the long term growth potential in the global power plant market.
>
> The company's third quarter fiscal 2016 GAAP guidance is as follows: revenue of $700 million to $800 million, gross margin of 14.5 percent to 16.5 percent and net loss of $5 million to net income of $20 million. Third quarter 2016 GAAP guidance includes the impact of the company's HoldCo asset strategy and revenue and timing deferrals due to real estate accounting. On a non-GAAP basis, the company expects revenue of $750 million to $850 million, gross margin of 16.5 percent to 18.5 percent, EBITDA of $115 million to $140 million and megawatts deployed in the range of 380 MW to 420 MW.

76. SunPower also held an earnings call on August 9, 2016 to discuss the 2Q'16 results. Defendant Werner stated:

> In the power plant segment, concern around an ITC cliff drove a concerted burst of large scale project construction in the first half of 2016, tied to specific contractual milestones. However, ***extension of the ITC largely removed the urgency for project construction*** in the second half of the year, temporarily shrinking the buyer universe, and ***decreasing both demand and pricing*** for projects completed in the second half of 2016 and 2017.

77. Defendant Boynton also discussed the impact of the ITC extension and bonus depreciation on the power plant segment:

> The extension of the ITC in late 2015 significantly altered the completion timing and PPA pricing dynamics for certain second half 2016 projects, delaying project completion schedules and reducing expected PPA pricing.
>
> Additionally, the inclusion of the bonus deprecation has reduced some of key customers' abilities to buy more projects as they have fully utilized their near-term tax equity capacity. This has also affected both project timing and pricing. ***Specifically, we had one project where the PPA off-take was in late-stage negotiation and the customer exited after the ITC extension***.
>
> ***We then expected to sign a PPA for this project in the first half of 2016 for 2016 delivery. We still expect to sign a PPA for this project in 2016, but now expect***

> ***2017 delivery***. Together, we expect these factors related to ITC and bonus depreciation extension will impact our second half 2016 EBITDA by between $70 million to $90 million.
>
> * * * * *
>
> As Tom detailed, we are seeing increased global competition in the power plant space as new entrants are bidding aggressive PPA prices. ***This more competitive PPA price environment impacted the final negotiated PPAs on certain projects we booked during the first half of 2016, and we believe that this will impact second half 2016 EBITDA by between $20 million to $30 million***.
>
> * * * * *
>
> As Tom mentioned, ***we have modified our power plant sales process to expand the universe of buyers***. ***In addition, we plan to partner with buyers for our projects earlier in the sales and financing cycle***. We expect this new process will increase competition and strengthen our relationship with the ultimate buyer.

78. Analysts on the call were shocked and questioned when management realized the impact the extension of the ITC would have on its business:

> <Q - Benjamin Joseph Kallo>: Okay. Number two. It seems like a whole lot of moving parts, just blind site me, maybe not everyone, but definitely me, when you guys have publicly spoken over the past near couple of weeks, we didn't hear any kind of hint of this, we've heard about some in the marketplace, but nothing of this kind of size. Realignment. And so, just, can you just tell us, when this all came to light here?
>
> <A - Tom H. Werner>: Yeah. This is Tom, and I'll take that question. So, in our prepared remarks, we talked about the factors that influence the power plant business and let me give you a little bit more color on those factors.
>
> ***So, we all know, that in December, the ITC was extended – I think what we talked about a little bit less was depreciation was part of that. Chuck mentioned in his remarks that [indiscernible] (36:05) on one of our projects, the counterparty stopped negotiating with us to close the PPA, when we were on a probable path to close a PPA with that customer.***
>
> ***As time went on, we had a replacement, customer for that project, as we did on other projects, those other projects actually booked, this project did not and we still expect it to book, but will not be in our P&L until next year. So, that project was directly impacted by the ITC/bonus depreciation extension***.
>
> ***As we got into the new year, buyers that were buying their projects, the impact of both the ITC and bonus depreciation became more apparent and***

> ***materialized in what they were willing to pay for solar projects***. And as we guide into April, the third week of April, SunEdison went bankrupt and that was another factor that influence how buyers thought of "perceived risk of solar projects."
>
> ***The combination of those things meant that, when we were selling projects in the last few months, the buyer universe had materially digested these changes, and their perceived risk and their price that we're willing to pay for projects that we closed over the last few months, two projects in particular***.
>
> We're lower than what our plan was and those projects will be going through our P&L in the back half of the year. ***And so, it's the evolution of our combination of ITC bonus depreciation, SunEdison bankruptcy, and then the other factors we mentioned on the phone, that materialized during the second quarter on a couple of our projects and pushed one project currently out of the year, and that's what happened.***
>
> * * * * *
>
> <Q - Krish Sankar>: Yeah. Hi, it's Bank of America Merrill Lynch. I have two quick questions, one, Tom, not to beat up on the power plant business. Some of ***these challenges of ITC extension and PPA pricing is not new news***, right. So, I'm just kind of trying to figure out the guidance downward shift, is it primarily on the margin, mainly due to a couple of SunPower specific projects, is a way to characterize it, or did PPA actually – pricing get exacerbated on the downside in the last three months? And then I had a follow-up.
>
> <A - Tom H. Werner>: Yeah. I think, to be clear, ***we have a site, had a buyer, or a PPA off-take. That negotiation failed in December directly correlated with the ITC. We had another buyer that may ultimately be – or another PPA off-take that may ultimately be the one that we sign for the project. And we still have confidence we will, but that has not gone as fast as we planned. That was part of the re-guide and that became clear as we got into the second quarter.***
>
> ***We were selling two projects in the second quarter, contracting to sell, two projects in the second quarter that had all of the factors that we mentioned in our narrative affect them. So, to the extent that it's SunPower-specific, it's that we had, did not have enough legacy PPAs to cover the year that we were perfecting new PPAs at the end of last year for this year***.

79. On this news, which took the market by surprise, SunPower's stock price fell $4.47 per share, or 30%, to close at $10.31 per share on August 10, 2016, on unusually heavy trading volume.

80. Following this news, Credit Suisse issued a report titled "SunBurned" calling management's credibility into question. "The company reduced 2H16 guidance ~40% and

provided 2017 guidance well below investor expectations (54% below prior analyst day targets). The cuts are problematic in their own rights, but the bigger issue for the stock from here is management credibility and lack of apparent stability in the core business. There are a lot of moving parts to the realigned SunPower that will require strong execution in the coming quarters, and with the stock down 30% after hours it is clear to us that management needs to start by repairing its reputation. We believe in the long-term secular growth story underpinning the renewable space, and management's typically conservative approach, but find the unexpected guidance cut – attributed to factors that should have been apparent many months ago – to be disconcerting."

81. An analyst covering SPWR at Avondale issued a report on August 10, 2010 stating, "SPWR's ahead-of-guidance 2Q results were rendered meaningless following management's 2H16 and FY17 guidance bomb and material strategy shift to restructure the Power Plant segment and focus almost exclusively on distributed generation."

82. Guggenheim's August 10, 2016 report stated, "2016 guide-down was a surprise as we expected FY results to be mostly safe at this point." It went on to note that "[g]iven the timing of the announcement that has startled the market, we think that management's credibility may be hurt in the near term." Guggenheim also noted that the majority of the guidance reduction was due to delayed PPA negotiations, which, as stated above, were due to the extension of the tax credits.

83. Janney's August 10, 2016 report discussed management's difficulty in explaining how the power plant business deteriorated so quickly:

> A dismal forward outlook. SPWR is seeing weakness in the powerplant end market, due to variety of factors. On the conference call, the company cited timing and demand impacts from the ITC extension, investor IRR hurdle rates increasing, increased power purchase agreement (PPA) competition and negative industry impacts from the SunEdison bankruptcy as primary reasons for the decline in its powerplant business. Management was questioned on when it knew this end market was in decline, given the change in tone from the 1Q16 call.

> * * * * *
> Ratings and valuation aside, the call last night did not go well for several reasons. Management had trouble (in our opinion) articulating how the powerplant business deteriorated so quickly versus commentary on the 1Q16 call, and was even queried about the timeline of events (realization and restructuring). Certainly we're asking ourselves if the 2017 EBITDA guidance is achievable given management's changes to 2016 guidance in just a one quarter timeframe. We see value in the underlying business and substantial long term growth in the end markets, but the near term outlook is dismal and visibility poor.

84. Although Defendants attempted to suggest that, in addition to the extension of the tax credits, the revised guidance was due to other factors as well, in fact the extension of the tax credits caused or exacerbated those problems. For instance, the issue of increased competition was massively exacerbated by the extension of the Investment Tax Credit. FE3 – a Senior Project Manager from mid-2015 to October 2016 who was responsible for project engineering, design, permitting, management of subcontractor bidding and quality oversight, working with the customer, and working with internal teams towards the completion of the project – explained, SunPower's products were more expensive, but also more efficient, than their competitors. However, during FE3's tenure, SunPower's competitors were able to make up considerable ground on the efficiency front, yet SunPower did not reduce its own prices to compensate. Thus, as time went on, SunPower's product was less and less competitive. The time pressure of the ITC was therefore beneficial to SunPower, because a longer time frame meant a longer opportunity for competitors to catch up. Ultimately, FE3 was laid off by SunPower in October 2016, along with 120 other employees (the first of several large rounds of layoffs by SunPower, according to FE3).

85. FE1 echoed the observations of FE3 regarding SunPower's offerings. According to FE1, prior to the Class Period, SunPower had generally offered higher efficiency, and higher priced, modules. The higher efficiency had enabled SunPower to be competitive even with higher prices. However, according the FE1, by late 2015 and into 2016, competitors had succeeded in increasing efficiency and still maintaining lower prices than SunPower. Thus, following the ITC extension, and the removal of time pressure to close deals, customers took

longer to negotiate among SunPower's competitors.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

86. Werner's and Boynton's scienter can be inferred from their knowledge, as each acknowledged in the earnings call on August 10, 2016, that at least one major customer cancelled negotiations in December of 2015 upon the extension of the Investment Tax Credit. In addition, Werner acknowledged that he that "[a]s we got into the new year [2016], buyers that were buying their projects, the impact of both the ITC and bonus depreciation became more apparent and materialized in what they were willing to pay for solar projects." Thus, Werner was aware at the beginning of 2016 that there was a slowdown in sales in 2016.

87. SunPower's scienter can be inferred from Boynton and Werner's scienter.

## CLASS ACTION ALLEGATIONS

88. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired SunPower securities between February 17, 2016, and August 9, 2016, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

89. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SunPower's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of SunPower shares were traded publicly during the Class Period on the NASDAQ. As of August 5, 2016, SunPower had 138,150,656 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by SunPower or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

90. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

92. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SunPower; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

93. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

94. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SunPower's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts

necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about SunPower's business, operations, and prospects as alleged herein.

95. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SunPower's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

96. The market for SunPower's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, SunPower's securities traded at artificially inflated prices during the Class Period. On March 17, 2016, the Company's stock price closed at a Class Period high of $24.74 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SunPower's securities and market information relating to SunPower, and have been damaged thereby.

97. During the Class Period, the artificial inflation of SunPower's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SunPower's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of SunPower and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

98. At all relevant times, the market for SunPower's securities was an efficient market for the following reasons, among others:

(a) SunPower stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, SunPower filed periodic public reports with the SEC and/or the NASDAQ;

(c) SunPower regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) SunPower was followed by dozens of securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

(e) SunPower an actively traded stock, with an average of 6.9% of SunPower

stock traded per week during the class period.

99. As a result of the foregoing, the market for SunPower's securities promptly digested current information regarding SunPower from all publicly available sources and reflected such information in SunPower's stock price. Under these circumstances, all purchasers of SunPower's securities during the Class Period suffered similar injury through their purchase of SunPower's securities at artificially inflated prices and a presumption of reliance applies.

100. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

101. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SunPower who knew that the statement was false when made.

## FIRST CLAIM
## Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
## Against All Defendants

102. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SunPower's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

104. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SunPower's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

105. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SunPower's financial well-being and prospects, as specified herein.

106. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of SunPower's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SunPower and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

107. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

108. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SunPower's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations,

financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

109. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SunPower's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired SunPower's securities during the Class Period at artificially high prices and were damaged thereby.

110. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that SunPower was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SunPower securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

111. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

112. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

113. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114. The Individual Defendants acted as controlling persons of SunPower within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

115. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

116. As set forth above, SunPower and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated: May 8, 2018

**GLANCY PRONGAY & MURRAY LLP**

By: *<u>/s/ Kara M. Wolke</u>*

Robert V. Prongay (SBN 270796)
Kara M. Wolke (SBN 241521)
Christopher Fallon (SBN 235684)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: RProngay@glancylaw.com
kwolke@glancylaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim, Esq. (admitted *pro hac vice*)
Jonathan Stern, Esq. (admitted *pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (213) 785-2610
Fax: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On May 8, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 8, 2018, at Los Angeles, California.

*s/ Kara M. Wolke*
Kara M. Wolke

# Mailing Information for a Case 3:16-cv-04710-RS In Re Sunpower Corporation Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **George Carlos Aguilar**
  GAguilar@robbinsarroyo.com,Notice@robbinsarroyo.com,rsalazar@robbinsarroyo.com
- **Lionel Z. Glancy**
  info@glancylaw.com,lglancy@glancylaw.com
- **Michael Goldberg**
  michael@goldberglawpc.com
- **J. Alexander Hood , II**
  ahood@pomlaw.com
- **Reed R. Kathrein**
  reed@hbsslaw.com,peterb@hbsslaw.com,brianm@hbsslaw.com,sf_filings@hbsslaw.com
- **Phillip C Kim**
  pkim@rosenlegal.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com
- **Charles Henry Linehan**
  clinehan@glancylaw.com
- **Adam Christopher McCall**
  amccall@zlk.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Lesley F Portnoy**
  lportnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com,bmurray@glancylaw.com
- **Rosemary M. Rivas**
  rrivas@zlk.com,qroberts@zlk.com,ebigelow@zlk.com
- **Quentin Alexandre Roberts**
  qroberts@zlk.com,ebigelow@zlk.com,rrivas@zlk.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net
- **Brian Schall**

brian@goldberglawpc.com



- **Steven Mark Schatz**
  sschatz@wsgr.com,ctalpas@wsgr.com,eblackey@wsgr.com

- **Jonathan Stern**
  jstern@rosenlegal.com

- **Diane Marie Walters**
  dwalters@wsgr.com,vshreve@wsgr.com

- **Kara M Wolke**
  kwolke@glancylaw.com,kara-wolke-0535@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Howard G. Smith**
Law Offices of Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020